**TAMPA ELECTRIC COMPANY,**
Plaintiff,

v.

**NASHVILLE COAL COMPANY, Nash-
ville Coal, Inc., West Kentucky Coal
Company, Defendants.**

Civ. A. No. 2418.

United States District Court
M. D. Tennessee,
Nashville Division.

Feb. 26, 1963.

William C. Chanler and Stephen A. Weiner, of Winthrop, Stimson, Putnam & Roberts, New York City, and David

Keeble, of Hooker, Keeble, Dodson & Harris, Nashville, Tenn., for plaintiff.

K. Norman Diamond, James R. McAlee and Melvin C. Garbow, of Arnold, Fortas & Porter, Washington, D. C., and Cecil Sims, of Bass, Berry & Sims, Nashville, Tenn., for defendants.

WILLIAM E. MILLER, Chief Judge.

Tampa Electric Company, plaintiff herein, is a large electrical utility company serving Tampa, Florida, and its metropolitan area. On May 23, 1955 it entered into a contract with the defendants' assignors for the sale and delivery to the plaintiff of all the coal required as fuel for the production of electrical energy at its newly constructed Gannon Station near Tampa, Florida, for a period of twenty years. The contract provided that the first two units of the plant then in operation would use coal as fuel, and that as to these units the full requirements should not be less than 225,-000 tons of coal per unit per year. It was further agreed that all future units constructed would be supplied by the Seller if the Buyer elects to use coal as fuel, two years' notice being required to be given the Seller indicating the Buyer's election. The contract fixed a minimum of $6.85 less a minimum rebate of 45 cents per ton for the first eighteen months and 30 cents per ton thereafter.

In November 1956, defendants requested the plaintiff to modify the price provisions of the contract and upon the plaintiff's refusal to do so, the defendants furnished the plaintiff with an opinion of defendants' counsel to the effect that the contract was illegal under Sec. 3 of the Clayton Act, 15 U.S.C.A. § 14, and Secs. 1 and 2 of the Sherman Act, 15 U.S.C.A. §§ 1 and 2. However, it was not until February 11, 1957, less than two months prior to the scheduled commencement of coal deliveries, that defendants informed plaintiff that the contract would not be performed.

Plaintiff filed suit for declaratory judgment in the Circuit Court of Hillsborough County, Florida, seeking a determination that the contract was valid and binding. This action, later removed to the U. S. District Court for the Southern District of Florida, was dismissed for want of jurisdiction on August 13, 1957. Plaintiff then brought the present action in this court seeking a judgment declaring the validity of the contract. Both parties having moved for summary judgment, the Court granted the defendants' motion and denied the motion of the plaintiff, holding that the contract was illegal under Section 3 of the Clayton Act, 168 F.Supp. 456. This judgment was affirmed by the Court of Appeals for the Sixth Circuit on April 4, 1960, 276 F.2d 766, but the Supreme Court on February 27, 1961 reversed and remanded the case to this Court for further proceedings not inconsistent with its opinion, 365 U.S. 320. In the meantime, while the case was pending on appeal, the plaintiff in February 1959 notified the defendants that it elected to terminate the contract due to the defendants' failure to perform, and that it would hold the defendants fully responsible for all damages caused by the breach.

On May 1, 1961, judgment was entered by this Court, pursuant to the mandate of the Supreme Court, that the contract, as amended, "is a valid, lawful and enforceable contract and is binding upon the plaintiff and the defendants according to its terms." The Court also reserved jurisdiction to grant such further relief against the defendants, or any of them, based upon such judgment, as may be necessary or proper.

On May 15, 1961 plaintiff filed a motion with this Court pursuant to 28 U.S.C.A. § 2202, in which it requested that it be awarded, after hearing, the damages which it had incurred as of March 31, 1961 by virtue of defendants' breach of contract. Following two pre-trial conferences the date for the hearing on plaintiff's damage claim was, after one postponement at defendants' request, designated as February 1, 1962. On January 19, 1962 plaintiff filed a supplemental motion for damages in which it requested the award of $3,964,670.98, the

total sum for which it now makes claim, covering the period from May 1, 1957, when the defendants were requested to begin deliveries under the contract, to February 1, 1962, the date of the trial on the damage claim. Attached to the supplemental motion was an exhibit showing the basis of computation for each alleged item of damage.

■ Where jurisdiction of an action in a federal court is dependent upon the diversity of citizenship of the parties, the Court will apply the law of conflicts of the state in which it sits. Klaxon Company v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); Insurance Research Serv. v. Associates Finance Corp., D.C., 134 F. Supp. 54, 58. There is no reason to believe that Tennessee would not follow the general conflicts rule which requires the courts of the forum state to apply the law of the state in which the contract is to be performed in determining the measure of damages for its breach. McCormick, Damages, Sec. 2 (1935); 11 Am. Jur., Conflicts, Sec. 134; Restatement, Conflicts, Sec. 372; cf. Gray v. Telegraph Co., 108 Tenn. 39, 64 S.W. 1063, 56 L.R.A. 301; Cooper, Caruthers & Co. v. Sanford, 12 Tenn. 452; Robinson v. Queen, 87 Tenn. 445, 446, 11 S.W. 38, 3 L.R.A. 214; Hubble v. Morristown Land Co., 95 Tenn. 585, 588–589, 32 S.W. 965.

Defendants' first insistence is that the plaintiff's claim for damages must be denied for the reason that the plaintiff has failed to prove any damage or loss over the life of the contract. They argue that the burden of proof rests upon the plaintiff in the case of an anticipatory breach of contract to establish by a preponderance of the evidence the fact that its accrued losses would not be offset in the future years of the original contract by savings resulting from the substitute arrangements which it is required to make to obtain its necessary supply of coal. For this purpose the defendants cite and primarily rely upon the decision of the Supreme Court of Florida in Gilliland v. Mercantile Inv. & Holding Co., 147

Fla. 613, 3 So.2d 148 (1941) in which the following statement was made:

"The plaintiff introduced no evidence of what he would have received had the liquidation been made as originally contemplated. He contends that the wrongful act of defendant making the fulfillment impossible dispensed with the necessity of such proof. He contends his action is for an anticipatory breach and that defendant's wrongful act has rendered proof of actual damage impossible and for that reason he is entitled to the maximum amount. With this we do not agree.
* * *

*"The plaintiff is held to the same degree of proof to recover damages in an action brought on an anticipatory breach as if he had waited until after the time elapsed for fulfillment of his contract."* (Emphasis supplied).

In the Gilliland case, the contract was for the plaintiff to receive a certain percentage in excess of liens and cash advances upon the liquidation of two companies. Plaintiff brought suit against the defendant for breach of contract on the grounds that the defendant had hindered and frustrated the liquidation, and also had sold and divested itself of all right to receive any sum under the plan of liquidation. In affirming the action of the trial court in directing a verdict on the ground that "plaintiff had proved no damage," the Supreme Court pointed out that "the plaintiff introduced no evidence of what he would have received had the liquidation been made as originally contemplated." It was the plaintiff's insistence that he was entitled to the maximum amount since the action was for an anticipatory breach and the defendant's wrongful act had rendered proof of actual damage impossible. In rejecting this argument, the Supreme Court held, as above stated, that the plaintiff is held to the same degree of proof to recover damages in an action brought on an anticipatory breach as if

he had waited until after the time elapsed for fulfillment of his contract.

It thus appears that the factual situations in the Gilliland case and in the present case are entirely different. In the Gilliland case, the plaintiff failed to prove the fact of damage. It was possible that there might not have been any sums upon the liquidation of the companies in excess of the stated sums which were necessary to satisfy cash advances and liens, and the essential failure on the part of plaintiff was the failure of proof that any damage had been sustained. In the instant situation, however, the plaintiff has proved accrued damages—it has established the fact of loss, and the question is whether it is to be denied recovery for such loss simply because it has not offered proof that such loss will not be wiped out over the remaining sixteen years of the contract. It is obvious that this presents a problem which was not dealt with in the simple terms of the Gilliland decision. The result reached in the Gilliland case was entirely equitable on the facts there presented, but to construe that decision as requiring proof that an accrued loss would continue to the end of an extended period upon the anticipatory breach of a long-term supply contract would distort its true meaning and purpose. The stability of enterprises dependent upon such long term supply contracts would be seriously impaired should the courts deny recovery of accrued losses because of failure to introduce proof that such losses would not be erased by events occurring over a protracted, uncertain, and highly speculative future period.

It is the plaintiff's argument that the case of Palmer v. Connecticut Ry. & Lighting Co., 311 U.S. 544, 61 S.Ct. 379, 85 L.Ed. 336, though involving a lease contract, provides a more logical solution to the question here in issue. In Palmer, a lease contract for a 999-year term at an agreed rent was breached after a small fraction of the term had expired. The Court of Appeals for the Second Circuit, rejecting the same contention which defendants employ in the instant case, held that it was error for the lower court to "hold that the inability of the claimant to prove damages over the entire 969 years sufficed to defeat the claim." 109 F.2d 568 at p. 571. The Supreme Court affirmed, utilizing a presumption that the agreed rent and the rental value of the leasehold for the remainder of the term are the same, allowing recovery of proven losses. 311 U.S. at p. 558, 61 S.Ct. at pp. 383–384, 85 L.Ed. 336. The Court further stated that "[t]he failure to produce further evidence * * * was not fatal to respondent's [lessor's] case." 311 U.S. at p. 562, 61 S.Ct. at pp. 385–386, 85 L.Ed. 336. Although Palmer arose out of a lease contract as opposed to a contract of sale, the rationale of the Supreme Court would appear to offer the more equitable approach in a situation where the difficulties of proof as to future events over a long period are practically insuperable. The Court of Appeals for this circuit applied the Palmer doctrine in permitting recovery of accrued damages for breach of a long-term storage contract, in Kessler v. Jefferson Storage Corp., 125 F.2d 108 (6th Cir., 1942), stating that "[i]n the absence of proof, it must be assumed that the contract value and the market value of the storage space, reserved by the bankrupt, are the same." 125 F.2d at p. 112. The Court is of the opinion that the Florida Supreme Court, if confronted with the precise facts of the present case, would follow the same doctrine and would not deny plaintiff recovery of its accrued damages because of failure to offer proof to negate the possibility of gain over the entire life of the long-term supply contract. For this reason the defendants' argument that plaintiff is not entitled to a recovery because of failure of such proof is not well taken.

Defendants further contend that the plaintiff is not entitled to recover its excess coal costs because it has failed to mitigate damages in its purchases of substitute coal. This item of excess cost as claimed by plaintiff is the sum of $2,-

513,043.39. It is contended that in purchasing substitute coal the plaintiff did not avail itself of offers at lower prices and that it was indifferent to and ignored costs in purchasing coal from Love & Amos and Peabody Coal Company during the years 1957–61.

■■ The purpose of the rule concerning damages for breach of contract is to put the injured party in as good a position as he would have occupied had complete performance been rendered by the defaulting party at the least necessary cost. 5 Corbin, Contracts, Sec. 1039 at p. 204. Furthermore, a "plaintiff is never given judgment for damages for losses that he could have avoided by reasonable effort without risk of other substantial loss or injury." Id. at pp. 204–205.

■ ■ If such plaintiff fails to exercise the "reasonable effort" and, consequently, his injuries are increased, then he cannot recover for the amount by which his injuries were so increased. However, the burden of showing that losses could have been avoided by reasonable effort and expense is on the party who breached the contract. Also, where the wronged party, in making a reasonable attempt to avoid the consequences of defendant's breach, incurs losses or additional expenses, such losses or additional expenses are recoverable as damages. Restatement, Contracts, Sec. 336 (2).

■■ The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." In re Kellett Aircraft Corp., 186 F.2d 197, 198–199 (3d Cir., 1950). As stated

in McCormick, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him." The Florida courts have adopted this rule of reasonable conduct as the measure of obligation of the injured party to mitigate damages. Moses v. Autuono, 56 Fla. 499, 504, 47 So. 925, 927, 20 L.R.A.,N.S., 350; Hodges v. A. P. Fries & Co., 34 Fla. 63, 75, 15 So. 682, 686. The plaintiff is not in the same position as an accounting trustee and the defendants cannot examine into the minutiae of its operations or insist upon perfection.

■■ Without examining the specifics of defendants' argument as to the alleged failure to mitigate damages, the Court is convinced, after careful consideration of the record, that the defendant has failed to establish that the plaintiff did not act reasonably under the existing circumstances in making purchases of substitute coal. In each instance plaintiff's decision appears to have been consistent with sound business judgment based upon the known facts. It is not for the Court at this late date to substitute its judgment for the reasonable business judgment of the plaintiff's management. For example, defendants complain that plaintiff could have saved $690,000 had it chosen to fill all its needs by Peabody waterborne coal, but the method of conveying coal by water was largely untried and unproven, and the plaintiff, being obligated to furnish power to its consumers, could not afford to rely completely on untested means of supply. Similarly, in other instances pointed out by the defendants, the plaintiff's decision was based upon considerations which cannot be characterized with any degree of fairness by the Court as unreasonable from the plaintiff's standpoint considering the situation in which it found itself, the nature of its business, and its continuing obligation to its consumers. Though it is shown, in the light of facts known in 1962, that savings could have been made

from other suppliers of coal, there is no showing that plaintiff's efforts to avoid further injury, or the considerations which prompted those efforts, were unreasonable under the circumstances.

Defendants maintain that since coal is a fungible commodity, there is no merit in plaintiff's contention to the effect that In re Kellett Aircraft Corp., 186 F.2d 197 (3rd Cir., 1950), authorized it to accept coal at a higher price than that at which other offers of supply were quoted. Granted that coal is a fungible commodity in some respects, where coal of a particular BTU [1] content is required, as in this case, where reliability of performance is mandatory, and where low ash fusion temperature is necessary, there is sufficient justification for the acceptance of bids promising to meet these requirements even at prices higher than those offered by others.

Plaintiff seeks to recover the cost of a permanent unloading facility for rail coal, the construction of which, it alleges, was necessitated by defendants' nonperformance. The unloading of the rail coal shipped prior to the building of this facility had been accomplished by what plaintiff characterized as "costly and inefficient" means. Therefore, subsequent to the institution of proceedings to compel performance of the contract by defendants plaintiffs replaced these "temporary" facilities with permanent ones costing $548,624.31.

In the case of Tampa Union Terminal Co. v. Richards, 108 Fla. 516, 530, 146 So. 591, 596 (1933), the Florida Supreme Court, quoting from the Restatement of Contracts, § 330, held that compensation would be given for those injuries " 'that the defendant had reason to foresee as a probable result of his breach when the contract was made.' "

It is indisputable that defendants herein should have foreseen at the time the contract was made that plaintiffs would be compelled to make substitute arrangements for the procurement of coal in the event of a failure of the waterborne deliveries. This is particularly true in view of the fact that this venture represented an attempt to utilize a source of power not in general use in Florida, a factor necessitating either rigid adherence to original delivery schedules by the vendor or a dependable alternative means of supply. Since the former was unavailable, plaintiff sought, through the construction of a permanent facility for the unloading of rail coal in conjunction with continued contractual relations with Love & Amos, to insure the arrival and efficient off-loading of sufficient quantities of rail coal to enable it to meet its obligations to its consumers.

It is manifest that there were only two reasonable alternatives for Tampa Electric Company subsequent to defendants' breach. It could either negotiate a new water-delivery contract, or it could depend upon supplies of coal delivered by rail. Tampa's choice of the latter with its attendant need for unloading facilities was within the reasonable contemplation of the parties at the time of the making of the contract.

Since the facility is a permanent asset and since the plaintiff specifically limits itself to damages which had accrued as of the date of the trial (February 1, 1962), it would not appear that it is entitled to recover the full cost of the facility. See Kanter v. Safran, 68 So.2d 533 (Sup.Ct.Fla.1953) citing C. D. Stimson Co. v. Porter, 195 F.2d 410, (10th Cir., 1952). It is true that the expense would not have been incurred except for the defendants' breach of contract, but the fact remains that the plaintiff retained the benefit of a permanent facility in obtaining its requirements for coal under a substitute contract. Such facility presumably will have some value as of the end of the original contract term. It also has a value to the plaintiff as of the cut-off date, February 1, 1962—a date voluntarily selected by plaintiff itself. The Court is of the

---

1. BTU's denote British Thermal units and constitute a measure of heat value in a given unit of coal.

opinion that the plaintiff is entitled to some portion of the expenditure necessitated by the defendants' breach but that the allowance of the full cost of the facility would not meet the equities of the case and would result in unjust enrichment to the plaintiff. The plaintiff in its brief suggests as an alternative to the allowance of the full cost of the facility as damages that it should be allowed the cost of the facility allocable to the term of the contract, using its own accounting depreciation figures as a basis. The figure so used for depreciation is 3% a year, consequently, under this method, the facility which commenced operating at the beginning of March 1959 would have depreciated 54.5% as of April 30, 1977, the termination date of the original contract, or the aggregate sum of $299,-002.25 of the original cost of $548,624.-31. The difficulty with this suggested method of computing damages is that the plaintiff has elected to limit its claim for damages to those accrued as of the date of the trial, as above pointed out. It has offered no proof of damages beyond that date upon the theory that the future is speculative and uncertain and that it is entitled as a matter of law to its accrued losses. It is inconsistent with this position to contend that the Court should undertake to determine the value of the facility to the plaintiff as of the end of the original contract term on April 30, 1977.

An equitable method of computation with respect to this item would appear to be to allow the plaintiff the original cost of the facility less the value of the facility to it as of the date of the trial. Such value can be determined by depreciating the facility at the rate of 3% per annum for the interval commencing on March 1, 1959, when the facility was first constructed, and terminating on the cut-off date of February 1, 1962. Utilizing this rate, the total depreciation for such period would be $48,004.63, or 8.75% of $548,624.31. The plaintiff is entitled to recover such amount as its compensable damage for this item since that amount fairly represents the difference between

the original cost of the facility and the value to the plaintiff of the facility as of February 1, 1962.

The same considerations govern the question of the recovery of the cost of the conveyor belt for which plaintiff seeks $20,201.26. This item was purchased, or put into use, on April 1, 1961. Employing the same depreciation percentage, and allowing recovery for the cost attributable to the period of the item's use prior to February 1, 1962, the recoverable portion of the expenditure would be the sum of $505.03, or 2.5% of $20,201.26.

The item of $9,022.54 expended for temporary rail unloading facilities is recoverable in its entirety. These facilities are no longer in use and no longer have any value to the plaintiff, having been replaced by the permanent unloading facilities in March 1959. The expenditure was necessitated by the defendants' breach of contract and was reasonably within the contemplation of the parties as a probable consequence of the breach. Similarly, the plaintiff is entitled to recover the item of $149,521.97, representing the excess labor cost incurred after the defendants' repudiation of contract in hiring labor to assist in unloading coal received by railroad cars. The major part of this expense was incurred during 1957 and 1958, prior to the time when plaintiff had an opportunity to put into operation permanent efficient rail unloading facilities. This expense was a direct consequence of the breach of contract and meets the test of reasonable foreseeability. Additionally, recoverable as general damage is the amount of $9,-603.20, representing the expense of limestone and shell and demurrage charges incurred by plaintiff in purchasing coal from other purchasers. The evidence makes it clear that these amounts were actually spent and that they would not have been incurred if defendants had performed the contract.

Plaintiff seeks to recover rental payments accrued to February 1, 1962, in the amount of $204,871.07, payable under the terms of an amendment to the orig-

inal contract executed by plaintiff and defendants on February 8, 1956. Pursuant to the amendment, plaintiff constructed a "heavily built dock" and defendants became obligated to pay an annual rental charge of 18% of $240,000, or approximately $43,000 for the use of the dock.

Defendants contend that there was no consideration received in return for the assumption of the obligation to pay the stipulated rental charges. To sustain this contention, defendants claim that plaintiff, under the original contract, was already obligated to construct such a dock and that the amendment represented no more, insofar as plaintiff was concerned, than a promise to perform a pre-existing duty, which, under Florida law, is no consideration. F. L. Stitt & Co., Inc. v. Powell, 94 Fla. 550, 114 So. 375 (Sup.Ct.Fla.1927).

 It is well settled that, in original contracts, the mutual obligations assumed by the parties to perform it constitute the necessary consideration. However, "[i]n order for the mutual promises of the parties to perform the modified contract to furnish the consideration necessary to support it, the modifying agreement must contemplate the assumption of additional burdens by both parties; that is, both parties must promise to do more or less than already required of them. If all the benefits fall on one person and all the burdens are saddled on the other, the modified agreement is nudum pactum." Annot., 43 A.L.R. 1451, 1469 (1926) and cases cited. That this is the Florida view, see International Shoe Co. v. Carmichael, Shoe Store, 114 So.2d 436 (Dist.Ct.App. 1st Dist.1959), citing Blair v. Howard, 144 Fla. 421, 198 So. 80 (Sup.Ct.Fla.Div. A 1940).

However, the proof shows that the original parties to the contract contemplated the construction, pursuant to the terms of the contract, of a facility designed to permit the "tying-up" of a self-unloading vessel. Such a facility would have cost substantially less than the one actually built. After West Kentucky Coal assumed the rights and obligations of the vendor under the contract, it was discovered and the evidence so indicates, that a self-unloading vessel would have been unavailable for about three years from the date delivery was to commence. It was therefore decided by the parties to utilize a "gantry type unloading tower" which, because of its extreme weight, would require a "heavily built dock." Pursuant to this determination, the parties, on February 8, 1956, executed an amendment to the original contract which, in essence, provided that plaintiff should bear the initial financial burden of constructing the more expensive dock facility, and that defendant should pay an annual rental amounting to 18 per cent of the difference in cost of the two facilities.

 It is apparent that there was consideration given in exchange for defendant's promise to pay rent. Plaintiff agreed to spend what amounted to a very large sum of money in excess of that contemplated by the original terms of the contract as necessary for the construction of dock facilities. The amendment represented a substantial modification of the rights and liabilities of the parties. Defendants' contention is without merit and plaintiff is entitled to recover $204,871.07 as unpaid rent.

Because of the fuel adjustment clause contained in the plaintiff's rate schedule, a major portion of the increase in fuel expense caused by the defendants' breach was "passed on" to the plaintiff's customers as the result of increases in rates. As the record shows, however, the plaintiff will be obligated to refund to its customers any amounts recovered as damages in this proceeding which represent increased fuel expense "passed on" to such customers. It is the defendants' theory that the plaintiff is not entitled to recover for excess coal costs to the extent that such excess costs have been passed on to its customers. It is argued that the plaintiff, having once obtained reimbursement from its customers, has suffered no injury or loss and that it may

not again recover the same costs from the defendants.

Defendants seek to support this defense mainly by relying upon cases decided under the anti-trust laws. In the first place, these cases predicate approval of the "passing on" defense on the wording of the Clayton Act. As stated in Northwestern Oil Co. v. Socony-Vacuum Oil Co., 138 F.2d 967, 971 (7th Cir., 1943), " * * * the Clayton Act does not permit recovery by plaintiff in causes such as this for unlawful prices as such but authorizes recovery only of pecuniary loss to property or business. * * * Inasmuch as plaintiff has wholly failed to prove any loss to its property or business but rather has shown, by all reasonable inferences, that the increased cost of which it complained was passed on to the ultimate consumer, the court rightfully directed a verdict for defendant."

As plaintiff so cogently urges, (1) the defendant in anti-trust actions is still subject to criminal and injunctive proceedings, and (2) recovery by the plaintiff would represent a windfall gain to him as such plaintiff is under no compulsion to return recovered damages to the consumer-purchaser, as is Tampa Electric Company in the instant case.

Defendant further contends that the case of Anniston Mfg. Co. v. Davis, 301 U.S. 337, 57 S.Ct. 816, 81 L.Ed. 1143 (1937) is authority for the allowance of the "passing on" defense in a common law action. The Supreme Court there held that processing taxes collected under the Agricultural Adjustment Act of 1933 were not to be refunded, pursuant to provisions of the Revenue Act of 1936, unless the claimant established to the satisfaction of the Board of Review that he bore the burden of the amount paid as tax. The latter statute is explicit in its requirement that the claimant be denied a refund where he has shifted the burden of the tax. The Anniston case thus lends no support to the passing on defense on the facts here presented.

Farrey's Inc. v. Supplee-Biddle Hdw. Co., 103 F.Supp. 488 (E.D.Pa.1932), is also distinguishable. There a buyer of rolls of barbed wire sued its supplier on a breach of warranty, proving that some of the rolls of wire were shorter than the supplier represented them to be. The court denied recovery (except as to a loss actually sustained by virtue of litigation instituted by a purchaser from plaintiff buyer) on the ground that since the buyer had resold the rolls of wire, including those the length of which was less than as represented, at a uniform price, it had suffered no damage attributable to the breach of warranty. Counsel for defendants herein contend that the Farrey's case represents judicial recognition of the "passing on" defense in common law actions. It is apparent, however, that to have allowed a recovery to the plaintiff in that case would have been to award it a windfall gain, since it would have been under no duty to pass the benefits of such recovery on to its customers. The contrary is true in this case. Moreover, Farrey's case was decided on the principle that plaintiff never experienced or suffered a loss until it was required to "make good to its customers." In contrast, the plaintiff in this case initially suffered or sustained an actual loss in being required to buy coal at higher prices to meet its needs.

As pointed out by Justice Holmes in Southern Pacific Co. v. Darnell-Taenzer Lumber Co., 245 U.S. 531, 533–534, 38 S.Ct. 186, 62 L.Ed. 451, the general tendency of the law is not to go beyond the first step or to inquire into subsequent events, but to consider the plaintiff's claim to have accrued at once in the theory of the law. As pointed out in the present case, the plaintiff will not receive a windfall gain by virtue of the allowance of the recovery of its excess costs which have been passed on to its customers. On the contrary, such recovery will redound to the benefit of the plaintiff's customers and not to the plaintiff. The defendants' theory would result in depriving the consuming public served by the plaintiff of refunds to which they would otherwise be entitled on the basis of an award of damages in

the present case. No sound reason can be advanced why a contract breaker himself should receive such a "windfall." The customers served by the plaintiff would have no standing to maintain an action against the defendants and unless the plaintiff is entitled to recover on the basis of its own initial loss, the defendants will largely escape the consequences of their breach of contract as to the item of excess coal costs. The effect of the defendants' theory would be seriously to impair the value of contracts negotiated by public utilities for necessary supplies of fuel to enable them to fulfill their obligations to the public. It would enable public utility fuel suppliers to break their supply contracts with impunity and thus introduce a serious element of confusion and uncertainty into such supply contracts. It is generally known that rate readjustment clauses are commonplace in the public utility industry.

As an element of damages, the plaintiff claims the allowance of interest at six per cent on each item of alleged loss from the time such loss was incurred. The Tennessee law appears to be clearly settled that the courts of that state in determining the allowance of interest on damages for breach of contract will be governed by the law of the place of performance. Cooper, Caruthers & Co. v. Sanford, 12 Tenn. (4 Yer.) 452 (1833); Bolton v. Street, 43 Tenn. (3 Col.) 31, 34 (1866). These rulings are in line with the general conflicts rule in Tennessee that the law of place of performance will be looked to in resolving contractual issues.

Plaintiff strenuously insists that, under the Florida decisions, interest is allowable on unliquidated damages arising from breach of contract "as a matter of right," and that the allowance of such interest is not discretionary with the Court. In support of this position, the plaintiff cites seven Florida decisions: Sullivan v. McMillan, 37 Fla. 134, 19 So. 340; Griffing Bros. Co. v. Winfield, 53 Fla. 589, 43 So. 687; McMillan v. Warren, 59 Fla. 578, 52 So. 825; Zorn v. Britton, 120 Fla. 304, 162 So. 879;

Kuharske v. Lake County Citrus Sales, Inc., Fla., 61 So.2d 495; Jackson Grain Co. v. Hoskins, Fla., 75 So.2d 306; Parker v. Brinson Construction Co., Fla., 78 So.2d 873. A careful reading of these cases discloses some expressions which lend support to the plaintiff's position, but when the facts and the results in each case are considered, the Court is unable to conclude that the Florida Supreme Court has definitively decided that interest accrues as a strict matter of right on unliquidated damages arising from breach of contract. There can be no doubt that the Florida courts have gone a long way to eradicate any difference between liquidated and unliquidated damages insofar as the allowance of interest is concerned. Nevertheless, the Court is convinced that the Florida law on this subject is as stated in 9 Florida Jurisprudence, Damages (1956 ed.), Sec. 86 as follows:

> "As a general rule, interest cannot be recovered on unliquidated claims or demands, as the person liable can be in no default for not paying where he does not know the sum he owes. * * * However, exceptions to this rule are recognized. Thus, interest is allowed as part of the damages where the demand, though unliquidated is capable of ascertainment by mere computation, or by reference to well-established standards of value."

In commenting upon the case of Sullivan v. McMillan, supra, the Supreme Court of California in Lineman v. Schmid, 32 Cal.2d 204 at 211–212, 195 P.2d 408, at 412, 4 A.L.R.2d 1380, 1386–1387, stated:

> "A reading of the opinion in the cited Florida case [Sullivan v. McMillan] indicates that *in fact the court followed the general rule* in determining the seller's right to interest on the damages due because of the buyer's failure to take logs under contract. The court said that *the evidence was so exact and definite as to the amount of the damages*

*that they could be readily ascertained by simple calculation."*

The Lineman opinion goes on to say, 32 Cal.2d at 212, 195 P.2d at 413, 4 A.L.R.2d at 1387:

"The rule appears to be uniform, whether the case involved contract price or reasonable value, that interest is not allowable when damages cannot be computed except on conflicting evidence, such as in the present case, because of the absence of established or reasonably ascertainable market prices or values. In such cases, since the amount of the damages cannot be resolved except by accord, verdict or judgment, interest prior to judgment, is not allowable."

Without exploring all of the facets and aspects of the Florida rule, it appears that in any event where damages are unliquidated in breach of contract cases interest should not be allowed unless the amount of the damages can be "readily ascertained by simple calculation." Applying this test to the facts here involved, the Court is of the opinion that the amount of damages with respect to some items can be ascertained by simple calculation, whereas the amount of damages as to other items can be computed only on the basis of conflicting evidence, inferences and interpretations. It is true that it is a matter of simple mathematical computation from the plaintiff's records to determine the difference between the amount which it actually paid for substitute coal after the defendants' breach of contract and the agreed contract price, but whether this difference is the true measure of the plaintiff's damage and the amount it is entitled to recover depends upon a consideration of a variety of factors derived from a mass of conflicting evidence, including the reasonableness of the amount paid, the availability of other sources of supply, the necessity and desirability of obtaining a steady supply of coal over a long period, the nature of plaintiff's business, its obligation to its customers, and finally, whether the plaintiff, on the basis of all the facts, acted reasonably and in accordance with reasonable business judgment. The question of mitigation of damages, although resolved by the Court in favor of the plaintiff, is one which is necessarily interrelated with the amount of damage and depends for its solution upon conflicting evidence from which different interpretations and inferences may be drawn. There was no way that the defendants could reasonably know, with any degree of definiteness or certainty, the amount they owed to the plaintiff with respect to this item until these conflicting factual and legal questions were determined. The Court has resolved in the plaintiff's favor all doubts as to whether it acted reasonably in making purchases of substitute coal inasmuch as the plaintiff should not be held to the strict accountability of a fiduciary or judged on the basis of knowledge which it did not have at the time. In view of the uncertainty as to the amount of damages and the wide latitude permitted by the Court to the plaintiff in making substitute purchases of coal after the defendants' breach of contract, the allowance of interest on the item of excess coal costs would be unjust and oppressive. Such a result in the Court's opinion is not required by the Florida decisions.

The same considerations apply to the item of permanent rail unloading facilities and the conveyor belt. Since these items constitute permanent assets which are of value to the plaintiff, the amount of damages arising from defendants' breach could not be ascertained by simple mathematical calculation. It is necessary to arrive at the true damages incurred to consider questions of depreciation, the period for which depreciation is to be computed, and the value of the facility to the plaintiff at a given time. Interest should therefore be disallowed on these two items.

All other items of allowable damage meet the test of certainty and can readily be ascertained by simple calculation, including excess labor cost, miscellaneous

expenses for purchasing coal (limestone and shell, demurrage charges), temporary rail unloading facilities and rental due on dock facilities. Interest should therefore be allowed on these items at the legal rate from the date the costs were incurred or expenditures made in accordance with the plaintiff's claim.

Other arguments made and defenses interposed by the defendants have been considered by the Court but are deemed to be without merit, requiring no detailed discussion.

The plaintiff's damages will therefore be allowed in the following amounts:

| | |
|---|---:|
| Difference between Actual Cost of Coal and Cost Under Contract | $2,513,043.39 |
| Excess Labor Cost | 149,521.97 |
| Interest at 6% per annum | 25,100.74 |
| Miscellaneous Expenses of Purchasing Coal | 9,603.20 |
| Interest at 6% per annum | 1,885.36 |
| Permanent rail unloading facilities | 48,004.63 |
| Conveyor belt | 505.03 |
| Temporary unloading facility | 9,022.54 |
| Interest at 6% per annum | 2,285.69 |
| Rental due on dock facilities | 204,871.07 |
| Interest at 6% per annum | 27,657.57 |
| | $2,991,501.19 |

The Court is in agreement with and approves all the proposed findings of fact and conclusions of law submitted by the plaintiff, except to the extent that such proposed findings and conclusions are inconsistent with or modified by this memorandum opinion. Such findings and conclusions will be revised accordingly and submitted in final form for approval by the Court and filing as a part of the record in the action. A form of judgment will also be submitted.