# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
May 4, 2004 Session

## AMC-TENNESSEE, INC. v. HILLCREST HEALTHCARE, LLC

Appeal from the Chancery Court for Davidson County
No. 99-2675-I    Irvin R. Kilcrease, Jr., Chancellor

No. M2003-00882-COA-R3-CV - **Filed November 8, 2004**

In this appeal arising from a breach of contract claim, the appellant, Hillcrest Healthcare, LLC challenges the trial court's award of damages in the amount of $337,363.59 including $219,937 in lost profits. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed and Remanded**

WILLIAM B. CAIN, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Robert A. Anderson, Nashville, Tennessee, for the appellant, Hillcrest Healthcare, LLC.

R. Dale Grimes, E. Steele Clayton, IV, and Gerald E. Martin, Nashville, Tennessee, for the appellee, AMC-Tennessee, Inc.

## OPINION

Plaintiff AMC-Tennessee, Inc. d/b/a The Pharmacy is a retail pharmacy located at 5764 Old Hickory Boulevard, Hermitage, Tennessee. Defendant Hillcrest Healthcare Center, LLC is a nursing home facility located at 111 East Lenox Street, Ashland City, Tennessee. On November 26, 1997, these parties entered into a contractual "pharmacy services agreement" under which The Pharmacy was to provide pharmacy services to the nursing home. The recitals of the contract state:

A.    The FACILITY is engaged in the operation of a nursing facility, for which it requires pharmacy services in accordance with applicable local, state and federal laws and regulations.

B.    The PHARMACY is qualified, licensed and capable of providing approved drugs, intravenous solutions, biologicals and pharmaceutical supplies as required by the residents of the FACILITY upon order of their physicians and

in accordance with accepted professional principles and applicable local, state and federal laws and regulations.

C. The FACILITY desires to utilize the PHARMACY's services, and the PHARMACY is willing to furnish such services as provided herein.

The nursing home breached the contract which, by its terms, was a three year contract expiring December 31, 2000. Hillcrest wrongfully terminated the contract on February 9, 1999, and The Pharmacy sued for breach of contract and resulting damages. Following a two day bench trial on October 28 and 29, 2002, the chancellor found that Hillcrest had breached the contract and entered a judgment for damages in a total amount of $337,363.59, such damages being comprised of:

a) $23,475.00 for Hillcrest Healthcare's outstanding balance due to The Pharmacy, plus

b) $15,141.59 for prejudgment interest on the outstanding balance, plus

c) $219,937.00 for lost profits for the remaining twenty-two months of the contract, plus

d) $78,810.00 for prejudgment interest on the lost profits.

Hillcrest appeals neither the trial court's breach of contract findings nor the trial court's dismissal of its counterclaim, but limits its appeal to the measure of damages awarded by the trial court.

The only issue on appeal as stated in the brief of Appellant is:

Whether the Trial Court erred in holding Hillcrest liable for the profits lost by The Pharmacy from the failure of private pay and/or Medicaid (TennCare) patients to remain customers of The Pharmacy when Hillcrest, by federal and state regulation, could not contract on behalf of those patients and could neither control the decisions of those patients as to the source of their pharmaceuticals nor guarantee nor promise to The Pharmacy that The Pharmacy would be the source of those patients' pharmaceuticals.

Further indicative of the limited scope of this appeal is a footnote appearing in the brief of Appellant which states:

Despite believing that there was a breach of contract by The Pharmacy the scope of this appeal is limited to the proper measure of damages for the claim of The Pharmacy. Hillcrest believes that there is sufficient proof in the record for this Court to sustain the Trial Court on the dismissal of its counter-claim based on T.R.A.P. Rule 13(d).

The thrust of Appellant's argument is that the base judgment awarded before computation of prejudgment interest should have been limited to $58,287 as lost profits from Medicare patients

only. It is asserted that the judgment erroneously included $115,556 for Medicaid (TennCare) patients and $46,094 for private pay patients. Hillcrest asserts that it was allowed by federal law to act only on behalf of Medicare patients when choosing a pharmacy and that since both Medicaid (TennCare) and private pay patients had an unconditional right to choose their own pharmacy Hillcrest is not liable under the contract for lost profits of The Pharmacy as to such patients. Specifically Hillcrest relies on the 1998 regulations for the Federal Government's Department of Health and Human Services Healthcare Financing Administration requirements for long term care facilities, which rule states in part:

> 42 CFR § 483.15 Quality of life.
> A facility must care for its residents in a manner and in an environment that promotes maintenance or enhancement of each resident's qualify of life.
>
> ...
>
> (b)  *Self-determination and participation.*  The resident has the right to -
> (1)  Choose activities, schedules, and health care consistent with his or her interests, assessments, and plans of care;
>
> 42 CFR § 483.15(b)(1)

The corresponding provision in state regulations appears in the rules of the Tennessee Department of Health under "Standards for Nursing Homes" at Rule 1200-8-6-.02(13) and reads: "(13)  The nursing home shall assure that each patient has a free choice of providers of medical services, such as, physician and pharmacy. However, medications must be supplied in packaging consistent with the medication system of the nursing home."

Regarding this distinction between Medicare patients on the one hand and Medicaid (TennCare) and private pay patients on the other, the President and founder of The Pharmacy, Charles E. Stephens, testified:

> Q.  Mr. Stephens, can you tell me what the general purpose of this services agreement was?
> A.  It's a contract between The Pharmacy and the facility to - - for The Pharmacy to provide medications for the residents, to be ordered by the facility.
> Q.  So I want to make sure I understand: Did The Pharmacy agree to ship all the medications that Hillcrest ordered for its patients?
> A.  Yes.
> Q.  Did Hillcrest agree to order all of its medications for its patients from The Pharmacy?
> A.  Yes, as they can.
> Q.  Okay. What do you mean by that?

A.      Patients are guaranteed, you know, other than being determined by the payer source, facilities have a right - - the patient has the right, freedom of choice of pharmacy. That's guaranteed federally.

Q.      Okay. What do you mean by "payer source"?

A.      Generally you have three or four types of payer sources in a facility. You'll have Medicare patients, who are - - the facility is the determining person that determines where those medications are ordered. You have Medicaid, or in our case TennCare patients, and they essentially have freedom of choice, but those are usually ordered from the preferred pharmacy by the facility. Then you have private pay or other insurances, and obviously those patients have the right to order where they - - their insurance or where they want to.

Q.      Where did the patients that were covered by Medicaid or private pay sources usually order their pharmaceuticals from?

A.      Most of the time they will order from the preferred pharmacy by the facility.

Q.      Why?

A.      Convenience, standardization of the system. You know, the facility has the ability to determine what medication dispensing system they will use within the facility, and normally the patients will concur with that, the choice of the facility.

The chancellor in construing the contract held:

> In November 1997, Hillcrest agreed with The Pharmacy to have The Pharmacy provide pharmaceuticals ("meds") to Hillcrest's patients. The Pharmacy had an obligation to deliver medications ordered by Hillcrest on behalf of its patients and to submit all bills for patients covered by Medicare directly to HIllcrest for payment on a monthly basis. Hillcrest had an obligation to order all of its patients' medications from The Pharmacy, except where the patient specifically requested that another pharmacy be used.

The limited appeal in this case stands or falls on the correctness of this holding by the chancellor.

There is nothing ambiguous about The Pharmacy Services Agreement in this case and the chancellor so held. The determining provisions of the contract are plain:

> 2.2      **Ordering**: THE FACILITY will order from the PHARMACY all drugs, intravenous solutions, biologicals and supplies for individual residents which are not commonly stocked in the FACILITY, except in cases where a resident has requested purchases be made from another pharmacy, in which case the request will be honored. The FACILITY may also purchase "house supply" items from the PHARMACY, as allowed by applicable local, state and federal laws and regulations.
>
> . . . .

2.3     **Billing Data and Reimbursement Status**:
The FACILITY will also notify the PHARMACY as to the status of each resident regarding source of reimbursement for drugs, intravenous solutions, biologicals and supplies. The FACILITY will notify the PHARMACY daily of any changes in resident medication upon receipt of physicians' orders or of changes as a result of room transfer or discharge. The FACILITY will give the PHARMACY reasonable access to all resident records, facilities and supplies necessary for the performance of the PHARMACY's duties under this Agreement, and the PHARMACY will furnish to the FACILITY, upon request, all information relating to the drugs, intravenous solutions, biologicals and supplies furnished to the FACILITY or to FACILITY residents.

Additionally, the FACILITY will provide to each resident, or the resident's sponsor, all applicable PHARMACY policies and procedures. The FACILITY will be responsible for obtaining appropriate billing consent signatures with respect to each resident for which the PHARMACY will perform billing and will furnish the PHARMACY with a copy.

. . . .

2.5     Policies and Procedures for Usage of Outside Pharmacies: In order to ensure consistent pharmacy services, proper medical care, cost-effective pharmacy services and supplies and lower risk of medication errors and nursing time, FACILITY will require all outside pharmacies which supply drugs, intravenous solutions, biologicals and supplies to residents within FACILITY to execute a contract with FACILITY. The contract will specify the policies and procedures for the dispensing of drugs, intravenous solutions, biologicals and supplies to FACILITY residents, including, at a minimum, provisions for reporting, packaging and labeling of all items dispensed in a manner consistent with the chosen dispensing system of FACILITY. The FACILITY will require that each resident electing to use a pharmacy other than the PHARMACY specify such election in writing, and the FACILITY will provide a copy of such election to the PHARMACY. The PHARMACY shall have no responsibilities for any such resident.

In the event a pharmacy other than the PHARMACY is utilized by any resident, the PHARMACY will bill the other pharmacy, and the FACILITY will require such other pharmacy to pay the PHARMACY, the applicable POS/MAR fee under Section 1.4 above. It will be the FACILITY's or outside pharmacy's responsibility to seek reimbursement from the resident, where necessary.

Specifically critical is the requirement in paragraph 2.5 of the contract that "[t]he FACILITY will require that each resident electing to use a pharmacy other than the PHARMACY specify such election in writing, and the FACILITY will provide a copy of such election to the PHARMACY. The PHARMACY shall have no responsibilities for any such resident."

Todd Hightower, Director of Operations for the parent company of Hillcrest testified:

Q.      All right.  Now, Tab 1 says, if you'll look for me over at Section 2.5, that deals with the use of an outside pharmacy while The Pharmacy is providing services to Hillcrest, right?
A.      That's correct.
Q.      Now, am I correct that you testified yesterday that in most cases the Medicaid and private pay patients will use the preferred provider?
A.      That is correct.
Q.      So you agree with that statement?
A.      Yes.
Q.      All right.  And Section 2.5, if you'll flip over on page four and look at the last paragraph, the last sentence - - I'm sorry.  The paragraph right above the last paragraph, the first paragraph with the sentences on page four, I'm going to read this section to you, just this sentence.  It says: The facility will require - - and the facility is Hillcrest - - will require that each resident electing to use a pharmacy other than The Pharmacy specify such election in writing and the facility will provide a copy of such election to The Pharmacy.
        Did you see where I read that?
A.      Yes.
Q.      So if there was a - - if there were people in 1998 that were Medicaid or private pay using an outside pharmacist, i.e., not The Pharmacy, the facility had to require that resident to specify it in writing, and Hillcrest was required to give The Pharmacy a copy of that; is that how you read that?
A.      Yes.
Q.      All right.  Have you seen any written election from any Medicaid or private pay patient at Hillcrest for 1998?
A.      No, I have not.
Q.      And you didn't, I assume, turn any such elections in writing over to your attorney to produce in this case.
A.      No, I did not.
Q.      Do you have any knowledge about any of these written elections being transmitted from Hillcrest to us?
A.      No, I do not.
Q.      To The Pharmacy?
A.      No, I do not.

So it is that Hillcrest acknowledges the contractual provisions requiring it to get from patients exercising their free choice of another pharmacy to serve their needs, a designation of that choice in writing, and further acknowledges that no such designations have ever been provided to The Pharmacy.

Since we find, as the trial court did, that the agreement is unambiguous, the interpretation of the terms of the agreement is a matter of law before this court on appeal. *See Hamblen County v. City of Morristown*, 656 S.W.2d 331, 335-336 (Tenn. 1983); *see also Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999). "This determination of the intention of the parties is generally treated as a question of law because the words of the contract are definite and undisputed, and in deciding the legal effect of the words, there is no genuine factual issue left for a jury to decide. *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)." *Bratton v. Bratton*, 136 S.W.3d 595, 601 (Tenn. 2004).

The plain language of the contract makes no differentiation between served patients other than identifying those who exercise their freedom of choice to obtain their pharmaceuticals elsewhere. The written contract clearly indicates that the parties contemplated provision of pharmaceuticals to Hillcrest residents requiring those services, regardless of payment source, unless they exercised their choice to use a different provider. The profits based on Medicaid (TennCare), Medicare and private pay patients for the fourteen months prior to Hillcrest's termination of the contract are an adequate basis for measuring damages for lost profits. *McClain v. Kimbrough Construction Co., Inc.*, 806 S.W.2d 194, 200-201 (Tenn.Ct.App. 1990).

Much is made on appeal of The Pharmacy's alleged failure to mitigate its damages. The plain language of the parties' contract accounts for Hillcrest patients' freedom to choose their own prescription service provider, with the understanding that in the absence of an affirmative exercise of that freedom, The Pharmacy would be expected to serve those patients' needs. It is undisputed that, once Hillcrest terminated the agreement with The Pharmacy, the latter's employees did not solicit business from the Tenn-Care and private pay patients. The well settled rule in this jurisdiction prohibits a plaintiff from recovering damages which, in the exercise of reasonable effort and expense, could be prevented or diminished. *See Arkansas River Packet Co. v. Hobbs*, 58 S.W. 278 (Tenn. 1900); *see also Southeastern Greyhound Lines v. Groves*, 136 S.W.2d 512 (Tenn. 1940); *Cummins v. Brodie*, 667 S.W.2d 759 (Tenn.Ct.App. 1983). The burden of showing that losses suffered from a breach of contract could have been avoided by reasonable effort and expense is placed squarely upon the breaching party. *See Tampa Electric Co. v. Nashville Coal Co.*, 214 F.Supp. 647, 652 (M.D. Tenn. 1963) (citing Restatement Contracts § 336(2)). In light of the plain language of the contract, it would indeed seem unreasonable and unduly burdensome to require The Pharmacy to solicit a new exercise of the freedom of choice by the very patients it 'lost' when it was terminated from the Hillcrest agreement. Although counsel for Hillcrest elicited testimony from the plaintiff that The Pharmacy did not seek to serve Tenn-Care and private pay patients, the record does not support any assertion that such solicitation would be reasonable under the circumstances.

Hillcrest's position would require The Pharmacy to pursue a course relative to Medicaid (TennCare) and private pay patients exactly opposite to their entitlement under the contract. Instead of having the benefit of the non-selection by such patients of an outside pharmacy they would be compelled to be the outside pharmacy, and actively solicit such patients to exercise their freedom of choice and make individual written designations of The Pharmacy. This cannot be reasonable:

> *Anderson-Gregory Co., Inc. v. Lea*, 51 Tenn.App. 612, 370 S.W.2d 934 (1963), held that in an action for a breach of contract the injured party is bound to use all proper means and efforts to protect himself from loss and can charge the other party only for such damages as by reasonable endeavors on his part he could not prevent. In accord with this statement is *Tampa Electric Company v. Nashville Coal Company*, 214 F.Supp. 647 (M.D.Tenn. 1963). However, this later case also says: ". . . the burden of showing that losses could have been avoided by reasonable effort and expense is on the party who breached the contract...." Also see: *State ex rel. Chapdelaine v. Torrence*, 532 S.W.2d 542 (Tenn. 1975), and *United States of America for the use of E & R Construction Co., Inc. v. Guy H. James Construction Co.*, 390 F.Supp. 1193 (M.D.Tenn. 1972).
> *Tampa, supra*, further holds:

>> The critical factor in determining fulfillment of a plaintiff's duty to mitigate is whether the method which he employed to avoid consequential injury was reasonable under the circumstances existing at the time. The rule with respect to the mitigation of damages may not be invoked by a contract breaker "as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter." *In re Kellett Aircraft Corp.*, 186 F.2d 197, 198-199 (3d Cir., 1950). As stated in McCormick, Damages, Sec. 35 (1935), "a wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him." ...

*Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn.Ct.App. 1979).

Thus, Hillcrest's assertion that The Pharmacy failed to mitigate its damages amounts to "hyper critical examination" of a course of conduct which never would have been considered had Hillcrest performed in accordance with the agreement.

The judgment of the trial court is in all respects affirmed and the case is remanded to the trial court for collection of the judgment.

Costs on appeal are assessed against Appellant.

_____
WILLIAM B. CAIN, JUDGE