## THE THOMAS P. SHELDON.

### THE S. L. WATSON.

#### (District Court, D. Rhode Island. January 24, 1902.)

#### Nos. 1060, 1062.

1. CONTRACTS—BREACH—RULE REQUIRING DILIGENCE TO AVOID OR LESSEN DAMAGE.

   The rule which requires reasonable diligence on the part of one injured by the breach of a contract by the other party to reduce the resulting damages should not be invoked by the party in fault as the basis for a critical examination of the conduct of the injured party, nor is he entitled to a reduction of the damages because he is able to show on afterthought that different action would have been more advantageous to him. Reasonably prudent action only is required.

2. MARITIME LIENS—BREACH OF CHARTER.

   The lien arising out of a contract of affreightment is created by the law, and is mutual and reciprocal between ship and cargo, attaching only when the cargo has been delivered on board or into the custody of the master, and being discharged when the cargo is delivered at its destination and the freight paid. Hence there is no lien in rem on a vessel for breach of a charter which is wholly executory, or which has been partly performed by the carriage and delivery of one or more, but not all, of the cargoes contracted to be carried.

3. ADMIRALTY—JOINDER OF CAUSES IN REM AND IN PERSONAM.

   There seems to be no fixed rule of admiralty practice, and no reason on general principles, which prevents the joinder in one libel of causes of action in rem and in personam, when such joinder will promote the cause of justice, and conduce to the convenience of the parties and the court, and is not governed by the admiralty rules of the supreme court.

In Admiralty. Suits for breach of charter party.

Carver & Blodgett, for libelant.

F. Dodge and H. Putnam, for claimants.

BROWN, District Judge. These libels are for breach of contract contained in a charter party dated July 26, 1899, providing for the carriage of five full cargoes of coal from Lambert's Point, Norfolk, Va., to Providence, R. I., by two barges,—the Thomas P. Sheldon and the S. L. Watson. The contract states: "It is understood that the above five cargoes are to be delivered in Providence previous to October 1st, 1899." In part execution of this contract, one cargo was carried by the Sheldon, and freight was paid. The libelant seeks damages for failure of the barges to carry the remaining four cargoes.

The first question relates to the authority of Stanwood, as agent, to sign the charter. I find as a matter of fact that on July 26th—the date of the charter—Stanwood was general agent of these barges, and was duly authorized to execute the charter. The libelee contends that his authority did not begin until August 1st, and was limited to making charters for single trips. I find against it both as to the date of the beginning of his authority and as to its scope. The testimony as to a limitation upon the number of voyages the agent could contract for was not satisfactory or convincing. But whether Stanwood's authority originated in the document of July 24th, or in previous arrangements, or on August 1st, does not seem to be of vital consequence. His authority as general agent extended over the period from August 1st to October 1st, within which the con-

templated voyages were to be made, and within which the agent, with full authority, entered upon the performance of the contract.

The next question is whether one or two cargoes were delivered under the contract. I find, as a fact, that but one cargo was delivered,—1,037 tons by the Sheldon. There is positive evidence that the cargo of 907 tons was carried by the Watson in pursuance of a previous oral charter. The testimony of Slater, agent of the Providence Gas Company, shows clearly that two distinct contracts were made for coal at different rates of freight. It is argued for the libelee that the Virginia Iron, Coal & Coke Company had existing engagements under two contracts for the delivery of 6,300 tons of coal to the Providence Gas Company; that, as the charter provides for five trips of about 1,250 tons each, this would have been an adequate tonnage to fulfil both contracts; and therefore that the oral charter, if one was made, was merged in the written charter. But this inference is not strong enough to overcome positive testimony to the contrary. It is entirely reasonable to suppose that the five-trip charter was simply for the conveyance of the 5,000 tons of coal purchased by the Providence Gas Company on its second contract. Though the charter states that the Sheldon and the Watson have a capacity of "about 1,250 tons each," this was manifestly much more than the actual carrying capacity of either of the barges. The cargo actually delivered by the Watson on the previous contract was 907 tons; that of the Sheldon, 1,037 tons. Gilchrist himself testifies that the capacity of the Watson was from 1,000 to 1,100 tons; and of the Sheldon, 1,100 tons. It is apparent, therefore, that five trips would have been insufficient, by more than 800 tons, to complete the carriage of the coal on both contracts. It is much more probable that five voyages were contracted for to carry the 5,000 tons than that they were contracted for to carry 6,300 tons. There is a strong preponderance of evidence to the effect that an oral charter was made which had no relation to the 5,000 tons, and that this charter was not merged in the written charter. Though this matter has been argued at some length, it is difficult to see what possible advantage could result to the libelee by adopting its argument. If, on its theory, we increase the amount delivered, we must consistently apply the same theory, and increase by a larger amount the quantity which it is bound to deliver. If we assume that the owner agreed to carry 6,250 tons of coal in five voyages, and that it has delivered two cargoes,—one of 907 tons, and the other of 1,037 tons, —amounting to 1,944 tons, it has, according to its argument, an undelivered remainder of 4,306 tons. The libelant claims that it is in default only to the amount of 4,024 tons.

The next matter to consider is the contention that the libelant prevented performance by its unreadiness to deliver coal. It is satisfactorily proved by the evidence of Wilmer that throughout the entire period from August 1st to October 1st, with the exception hereafter to be mentioned, there was an ample supply of coal on hand to furnish full cargoes to either the Watson or the Sheldon. Nothing was done by the libelee until the barge Georger reported on September 18th, being tendered as a substitute. Her turn did not arrive, however, until after October 1st, the date specified in the con-

tract for the completion of the delivery of the five cargoes. The owner was then already in default, and in no condition to take technical advantage of breaches by the charterer after that date. While there was a partial shortage of coal from the 29th of September to the 4th of October, this would not have resulted in any special delay, —probably not more than two or three days; nor did it absolve the owner from the consequences of its negligence in not earlier reporting vessels for the remaining four cargoes. Upon the evidence, the charterer was ready and willing to make substantial performance upon its part, and the withdrawal of the Georger was not justified under the circumstances existing, and renders her tender of no avail.

It is contended that the detention of the Georger was due to the preference of steamers arriving for bunker coal; but the evidence as to the rule of the port that steam vessels are entitled to this preference is not contradicted, and is not met merely by characterizing such preference as extraordinary. The owners were chargeable with knowledge of the usage of the port. Randall v. Sprague, 21 C. C. A. 334, 74 Fed. 247.

I am of the opinion that there is no evidence to sustain the contention that the barge Page was tendered in substitution.

I find that the owner, the Lake Shore Transit Company, is liable in damages for its breach of contract to the amount of the increased freight for the substituted tonnage, to wit, 95 cents per ton on 4,024 tons, amounting to $3,822.80; and also to the amount of $985.81, paid by the libelant for demurrage, not due to its fault, on the substituted vessels; making a total of $4,808.61, with interest from the date of the filing of the libel.

I see no reason for reducing the damages by the application of the rule of Warren v. Stoddart, 105 U. S. 230, 26 L. Ed. 1117, which requires reasonable effort to reduce damages. The delay in procuring other vessels, caused by negotiations and efforts to induce the libelee to perform its legal obligation, was, under the circumstances, both reasonable and prudent. Furthermore, it was necessary for the libelant to modify its contract with the gas company in consequence of the inability to get barges. It proceeded with reasonable diligence to do this, and to get the best terms for sailing vessels. The rule of Warren v. Stoddart requires reasonable conduct on the part of one whose legal rights have been violated; but it should not be invoked by a defendant as a basis for critical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which were wiser or more advantageous to the defendant. Reasonably prudent action is required; not that action which the defendant, upon afterthought, may be able to show would have been more advantageous to him.

It is next necessary to consider the form of the libels, and the decree to be made upon each. The libel against the Sheldon is solely in rem. She carried one cargo under the contract; but no other cargo was set apart for her by the charterer, or delivered to her, or came under the control of the master. The Watson carried no cargo under the contract; nor was any cargo set apart for her, or deliv-

ered to her, or to the control of her master. So far as the libelant is proceeding in rem, a decision that the Sheldon is not liable in rem necessarily involves a decision that the Watson is not liable in rem, and renders it unnecessary to consider objections to a lien upon the Watson which are inapplicable in the case of the Sheldon. According to the weight of authority, a vessel is not liable in rem for the breach of a contract of charter party wholly executory. The Monte A. (D. C.) 12 Fed. 331, and The Ira Chaffee (D. C.) 2 Fed. 401, contain learned discussions of the authorities upon this subject. See, also, The General Sheridan, 2 Ben. 294, Fed. Cas. No. 5,319; The William Fletcher, 8 Ben. 537, Fed. Cas. No. 17,692; The Asa Eldridge (D. C.) 8 Fed. 720; The City of Baton Rouge (C. C.) 19 Fed. 461; The Missouri (D. C.) 30 Fed. 384; The Eugene (D. C.) 83 Fed. 222; Id., 31 C. C. A. 345, 87 Fed. 1001; The Bella (D. C.) 91 Fed. 540; The Ripon City, 42 C. C. A. 247, 102 Fed. 176, 180; The Universe (D. C.) 108 Fed. 968. The libelant contends, however, that, if any cargo has been taken under the contract of affreightment, the right in rem attaches for full performance. If there is, in this case, a lien in rem, it is difficult to see upon what principle we are to base it. The lien does not arise from the contract itself, but is created by the law upon a delivery of a cargo to the vessel or to the control of the master. What is the extent and character of the lien created by the law upon such delivery?

In The Freeman v. Buckingham, 18 How. 182, 188, 15 L. Ed. 341, 344, it was said:

"Under the maritime law of the United States the vessel is bound to the cargo, and the cargo to the vessel, for the performance of a contract of affreightment; but the law creates no lien on a vessel as a security for the performance of a contract to transport cargo until some lawful contract of affreightment is made, and a cargo shipped under it."

In Vandewater v. Mills, 19 How. 82, 90, 15 L. Ed. 554, 556, it was said:

"Now, it is a doctrine not to be found in any treatise on maritime law that every contract by the owner or master of a vessel for the future employment of it hypothecates the vessel for its performance. This lien or privilege is founded on the rule of maritime law as stated by Cleirac, 597: 'Le batel est obligée à la marchandise et la marchandise au batel.' The obligation is mutual and reciprocal."

In The Lady Franklin, 8 Wall. 325, 329, 19 L. Ed. 455, 457, it was said:

"The doctrine that the obligation between ship and cargo is mutual and reciprocal, and does not attach until the cargo is on board or in the custody of the master, has been so often discussed, and so long settled, that it would be useless labor to restate it, or the principles which lie at its foundation."

In The Keokuk, 9 Wall. 517, 519, 19 L. Ed. 744, 745, it was said:

"It is a principle of maritime law that the owner of the cargo has a lien on the vessel for any injury he may sustain by the fault of the vessel or the master; but the law creates no lien on a vessel as a security for the performance of a contract to transport a cargo until some lawful contract of affreightment is made, and the cargo to which it relates has been delivered to the custody of the master, or some one authorized to receive it."

It seems very clear from these authorities that the contract itself creates no lien, and that the lien which is created by the law is mutual and reciprocal. The parties to this contract undoubtedly had mutual

and reciprocal rights of lien during the carriage of the first cargo, but the lien of the ship on cargo was discharged by the payment of freight and by delivery to the consignee. The contention that the lien in rem now exists cannot be based upon the principle that the ship is pledged to the cargo and the cargo to the ship; and, if there is a lien, it is unilateral, and not mutual or reciprocal. The libelant argues that we are to infer that part performance of an executory contract for the carriage of a number of cargoes creates a lien from the following language in The Freeman v. Buckingham, 18 How. 182, 188, 15 L. Ed. 341, 344:

"But the law creates no lien on a vessel as a security for the performance of a contract to transport cargo until some lawful contract of affreightment is made, and a cargo shipped under it."

But the preceding language, stating the principle that the vessel is bound to the cargo and the cargo to the vessel, as well as the other extracts from decisions of the supreme court, declares so clearly the rule that the lien created is a mutual and reciprocal lien as to exclude the view that a shipment of a single cargo, to which the shipowner's lien is limited in respect to a single voyage, creates in favor of the cargo owner a unilateral lien upon the ship for the performance of the contract to carry other cargoes. The lien of the cargo owner upon the ship must, therefore, be limited by the corresponding and reciprocal rights of the ship owner upon the cargo.

The libelant contends that the courts have held that, where any cargo has been taken under the contract of affreightment, the right in rem attaches for the full performance of the contract, "thereby brushing aside the theory of reciprocal rights only, and admitting a full right in rem wherever the contract has become in any part executed." This is practically a concession that, unless the theory of reciprocal rights can be brushed aside, and unless we are to treat these repeated expressions of the supreme court as mere dicta, we must deny the libelant's right to proceed in rem. The libelant has presented no authority which states any principle upon which a part performance which does not create a mutual and reciprocal lien can create a unilateral lien. Part performance gives no further validity to the contract, since the contract is valid irrespective of performance.

The libelee cites the case of The G. L. Rosenthal (D. C.) 57 Fed. 254, and The Oscoda (D. C.) 66 Fed. 347, and points out that these cases are distinguishable from the present case by the fact that they were upon towage contracts, and that by part performance a reciprocal lien between the tug and the tow had been established. In the present case no lien ever arose in favor of the vessel in respect to the four cargoes, for noncarriage of which the libel is brought.

While it may be considered a hardship that the charterer should have no remedy against the vessel for an abandonment after she had entered upon a contract contemplating numerous voyages, the hardship is no greater than where, after making the contract, she has failed to perform any part of it; and, though there may be dicta to the effect that, if a ship enters upon performance, it be-

comes pledged to the complete execution of the contract, no argument has been advanced nor case presented which sets forth any satisfactory reason why we should not apply in this case the principles reiterated by the supreme court that the maritime lien between the cargo owner and the ship owner in respect to the carriage of cargoes is a mutual and reciprocal lien, not arising from the contract itself, but created by law upon the delivery of the cargo to the vessel, or to the control of the master.

While there may be, and probably are, other considerations which should be taken into account, they have not been presented, nor have they occurred to me. I therefore feel constrained to decide this case upon the principles of law that have been argued. No authority has been presented which would justify an acceptance of the libelant's contention that the theory of reciprocal rights so clearly stated by the supreme court has been brushed aside.

The libelee, by timely exceptions, raised the question of the right to join in one libel a cause of action in rem and a cause of action in personam. This question was before this court in the case of Heney v. The Josie, 59 Fed. 782. Judge Carpenter, in delivering the opinion of the court, said:

"The general principle is that several issues may be tried in one action when that course will promote the cause of justice, and conduce to the convenience of parties and of the court, and when no considerable inconvenience will arise therefrom. On this principle actions are sustained against a defendant for several independent but analogous claims, and also against several defendants for claims arising out of the same transaction, where the claims themselves are analogous. On general principles, there is no reason why a libel both in rem and in personam should not be retained in cases where the matter comes within the above definition, and when this practice is not forbidden by the rules of the supreme court."

In The Eliza Lines (C. C.) 61 Fed. 308, 324, Judge Putnam had occasion to consider an objection to the joinder of a proceeding in rem with one in personam; and, holding that this technical question of pleading had been waived, intimated by a dictum that, if it was necessary to consider the fundamental question involved, the court would probably come to the same result. While I incline to the view that in a case like the present, not provided for by the admiralty rules of the supreme court, there is no fixed rule which prevents the joinder in one libel of causes of action in rem and in personam, and that the present joinder was justifiable and for the convenience of all parties, I do not deem it necessary to dwell upon or to decide this point; for the libel against the Watson and the Lake Shore Transit Company, which joined proceedings in rem with proceedings in personam, must be dismissed so far as it is in rem, and in retaining it as a proceeding in personam I follow the suggestion of the brief for the libelee.

Decrees may be presented dismissing the libel No. 1,062 against the Sheldon, with costs to the libelee; dismissing the libel in No. 1,060, so far as it is in rem, against the Watson, with such costs as the libelee may have sustained by reason of the seizure; and awarding damages against the Lake Shore Transit Company in the sum of $4,808.61, with interest from the date of the filing of the libel, and with costs as upon a libel in personam.