In re KELLETT AIRCRAFT CORP.

No. 10207.

United States Court of Appeals
Third Circuit.

Argued Oct. 17, 1950.

Decided Dec. 27, 1950.

198

Harry Shapiro, Philadelphia, Pa. (Shapiro, Conner, Rosenfeld & Stalberg, Philadelphia, Pa., on the brief), for appellant.

Robert S. Ingersoll, Jr., Philadelphia, Pa. (Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., on the brief), for appellee.

Before BIGGS, Chief Judge, and KALODNER and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This case comes before us on appeal from an order of the United States District Court for the Eastern District of Pennsylvania confirming the findings of a special master with reference to a claim presented in a corporate reorganization proceeding under the National Bankruptcy Act, 11 U.S.C.A. § 1 et seq. The claim is based upon a breach of contract by the debtor, Kellett Aircraft Corporation, to make and assemble certain stall showers for Amerform Corporation. Amerform had the work done by Cutler, Inc. at a higher cost even though another manufacturer, Luscombe, made an offer to do the job at substantially the same cost as the defaulting Kellett. The amount claimed and disallowed represents the excess cost occasioned by the award of the contract to Cutler.

The breach of contract is admitted. The question to be decided by this court is whether the buyer's selection of the higher of two bidders to perform a contract breached by the seller was consistent with its obligation to mitigate damages caused by the seller's default.

 Whether or not the buyer's obligation to mitigate damages has been discharged depends on the reasonableness of its conduct. In this connection, reasonable conduct is to be determined from all the facts and circumstances of each case,[1] and must be judged in the light of one viewing the situation at the time the problem was presented. Where a choice has been required between two reasonable courses, the person whose wrong forced the choice can not complain that one rather than the other was chosen.[2] The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken

1. Steger et al. v. Orth, 2 Cir., 1919; 258 F. 619; Wavra v. Karr et al., 1919, 142 Minn. 248, 172 N.W. 118; Sauer et al. v. McClintic-Marshall Const. Co., 1915, 189 Mich. 577, 155 N.W. 586.

"* * * the standard of due care in determining liability in tort for negligence should be much stricter than the standard of reasonableness in choice of expedients to reduce or avoid damages applied against a person against whom a wrong has been committed." McCormick on Damages, § 35 (1935).

2. McCormick on Damages, § 35 (1935).

steps which seemed wiser or would have been more advantageous to the defaulter.[3] One is not obligated to exalt the interests of the defaulter to his own probable detriment.[4] With these criteria as guides, we examine the conduct of the claimant.

Kellett undertook to fabricate 5,000 shower cabinets at $13.18 each plus $3,331 for tooling costs. The cabinets were needed by Amerform, as Kellett knew, to fulfill a government order calling for deliveries in July, August, and September, 1946. On September 16, 1946, Kellett stated in writing its inability to perform. Amerform immediately approached some four or five companies located in various Pennsylvania and New Jersey cities in an effort to procure the cabinets as soon as possible. Cutler, which had previously made identical cabinets for Amerform and which already had the necessary dies and tools, offered to perform at a price of $18 per cabinet. Production was to be scheduled in accordance with the immediate availability of materials and a night shift was to be added to accelerate production. Several days after the Cutler offer, Luscombe proposed to make the cabinets at the price formerly agreed by Kellett, $13.18, except for an additional $500 for tooling. Luscombe, however, informed Amerform that it had to look to the defaulting Kellett to fabricate the tools and dies and promised to begin delivery of the cabinets four weeks after the tools and dies should have been delivered.[5] The sales manager of the Amerform Corporation testified before the special master that he personally went to the Luscombe plant "for the purpose of examining their facilities, equipment, and so forth, to see whether they could turn out several thousand cabinets, * * *."

On September 27, 1946, 11 days after Kellett's breach, 7 days after Cutler's offer, and 3 days after Luscombe's offer, Amerform awarded a contract to Cutler for 6,000 cabinets. Some two weeks later, Amerform awarded Luscombe a contract for 2,000 steel shower cabinets and at approximately the same time awarded Luscombe another contract for 5,000 aluminum shower cabinets. The special master found these facts highly significant in reflecting "that the claimant considered Luscombe a responsible party with whom a contract could be placed".

This high regard for Luscombe as a producer of goods which, according to uncontradicted testimony, were ordered "in the expectation of getting an additional order from the Government" is necessarily different in character from the regard a prudent business man would hold for the offer made by the same company when the job involved was the production of goods for quick delivery. For while Cutler offered the prospect of immediate beginning of production on a large scale, Luscombe, by its own admission, could not expect production until some four weeks after the uncertain date when tools and dies would be obtained from the defaulting Kellett, and even then on a small, if accelerating scale. We do not consider it significant that Luscombe "actually did deliver in advance of any delivery by Cutler" as found by the special master. To allow such evidence to weigh in favor of the defaulting supplier would be unfairly to exalt the certainty of hindsight over the reasonable anticipation of foresight.[6] The claimant acted promptly and diligently. In all the circumstances, we consider it the exercise of prudent business judgment and in no way unreasonable

3. The Thomas P. Sheldon, D.C.R.I.1902, 113 F. 779.

4. City of Bridgeport v. Aetna Indemnity Co., 1919, 93 Conn. 277, 105 A. 680.

5. In detail, Luscombe's undertaking was as follows:
 "Delivery
 "Start four weeks after receipt of materials and tools from [Amerform which in turn had to procure them from Kellett.]
 "1st week—10 units
 "2nd week—50 units
 "3rd week—100 units
 "4th week—250 units
 "5th week—400 units
 "6th week—500 units
 "500 per week thereafter"

6. See The Thomas P. Sheldon, supra.

conduct for Amerform to have awarded the contract at somewhat increased cost to one whose performance had on previous occasions proved satisfactory, who had at hand proper and adequate tools for the job, and who promised to get on with it at once.

■■■ We are, as appellees urge, normally required to accept such findings of fact of the master as are confirmed by the district court, if these findings are not clearly erroneous. Fed.R.Civ.P.Rule 52(a).[7] This requirement includes a duty to accept also such purely factual inferences as are drawn by the master. But this rule refers to questions involving issues of credibility of witnesses, or disputes as to basic facts. See Davis v. Schwartz, 1895, 155 U.S. 631, 636, 15 S.Ct. 237, 39 L.Ed. 289; Anderson et al., v. Mt. Clemens Pottery Co., 1946, 328 U.S. 680, 689, 66 S.Ct. 1187, 90 L.Ed. 1515. So far as the disposition of this case requires us to draw legal conclusions or inferences from undisputed facts, the rule is not relevant. We are as capable as either the master or the district court of making a determination from the record before us whether the claimant exercised the reasonable judgment required of him in awarding the Kellett contract to Cutler. Lone Star Gas Co. v. City of Fort Worth et al., 5 Cir., 1938, 93 F.2d 584; Michelsen v. Penney, 2 Cir., 1943, 135 F.2d 409; Adams County v. Northern Pac. Ry. Co., 9 Cir., 1940, 115 F.2d 768, 779; Stewart v. Ganey, 5 Cir., 1940, 116 F.2d 1010. Although there was conflicting testimony before the master, none of it, as we have shown, can establish that Amerform in any way failed to do its duty.[8]

This court has squarely held that Rule 52(a) does not impose the clearly erroneous standard of finality on "the inferences or conclusions drawn by the trial court from its fact findings." Kuhn v. Princess Lida of Thurn & Taxis, 1941, 119 F.2d 704, 705. In that case the district court, sitting without a jury, had awarded the plaintiff in a suit for legal fees the sum of $8,500 as the reasonable value of his services. The principal basis for the award of this amount was the lower court's finding of "the difficulty of the legal problem confronting the plaintiff, as defendant's counsel". Because the legal problem involved was solely one of law, this court considered that it could determine for itself whether the legal problem was as difficult as the lower court said it was. The lower court's factual finding, because it dealt merely with conclusions from undisputed facts was thus deprived of Rule 52(a) finality.

A similar problem has been more recently dealt with by this court in similar fashion, albeit over the dissent of Judge Goodrich. See Ball v. Paramount Pictures, 1948, 169 F.2d 317, certiorari denied, 1949, 339 U.S. 911, 70 S.Ct. 568. There, the issue was whether all the facts before the trial court showed the existence of a conspiracy in violation of the antitrust laws. The court substituted its conclusion on that issue for the conclusion reached by the district court, relying, for its power to do so, on the Kuhn case, supra.

It follows that the judgment will be reversed, and the cause remanded for the allowance of the claim in amount properly determined in accordance with this opinion.

---

7. Fed.R.Civ.P. Rule 53(e) (2), 28 U.S.C. A., requires the district court to accept the findings of fact of the master unless they are "clearly erroneous."

8. One important issue might be taken to have involved a question of credibility. The special master specifically found that the claimant's assertion that time was of "'extreme essence' * * * is not founded on fact. The fact is that the requirement of the contract with F.P. H.A. for the delivery of 6,000 shower cabinets in the months of July, August, and September had been violated by practically a month before the contract was let to Cutler. There is no testimony before the Special Master of substituted dates for delivery of the shower cabinets, but the fact is that the Government had already waived that provision in the contract."

But if F.P.H.A. were not insisting strictly on the performance dates set out in its Amerform contract, it is obvious that Amerform, thus operating on borrowed time, would be greatly concerned that its commitments be carried out with all expedition the circumstances permitted. This finding of the master, thus, can hardly be used as an adequate basis for his conclusion.