COMPAÑÍA DE FOMENTO INDUSTRIAL, demandante y recurrente, *v.* LEONARDO LEÓN ROSADO y AMERICAN SURETY COMPANY OF NEW YORK, demandados y recurridos.

*Número:* R-66-138      *Resuelto:* 8 de febrero de 1971

634

*Juan Enrique Géigel, Guillermo Silva, Hernán G. Pesquera, E. Rodríguez Font* e *I. Rivera Cordero,* abogados del recurrente; *Castro & Castro,* abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR RIGAU emitió la opinión del Tribunal.

Se trata de una acción para recobrar daños líquidos, pactados y afianzados, por incumplimiento de contrato y de otra suma por concepto de costo de construcción de una obra en exceso del precio alzado y convenido, a tenor también con lo contratado.

El tribunal de instancia declaró con lugar la demanda pero incurrió en errores de interpretación del contrato de fianza, los cuales lo llevaron a su vez a incurrir en errores de cálculos sobre las sumas a pagarse a la recurrente por la fiadora.

La demandante recurrente, Compañía de Fomento Industrial de Puerto Rico, contrató con Leonardo León Rosado, el contratista, el desarrollo de los terrenos de una urbanización industrial en el barrio Sabana Abajo de Carolina, P.R. El precio inicial convenido por las partes contratantes fue de $368,400.00.(1) La obra habría de comenzar para el 29 de febrero de 1960 y habría de estar terminada en o antes del 27 de agosto de dicho año. El contrato permitía la concesión de prórrogas por distintas causas, entre ellas, el mal tiempo. Se concedieron prórrogas por esa razón.

Simultáneamente con el contrato de construcción, el contratista, como principal y la aquí recurrida, American Surety Company of New York, como fiadora, suscribieron a favor de la recurrente una fianza de ejecución (*Performance Bond*) por la suma de $368,400.00, el precio inicial de la obra, para garantizar el fiel cumplimiento del mencionado contrato. Se convino en el contrato que todo retraso no autorizado estaría sujeto a una indemnización de $200.00 diarios.

La Compañía de Fomento Industrial concedió al contratista varias prórrogas que extendieron el término de entrega de la obra hasta el 24 de enero de 1961. En vista de que el contratista no completaba la obra, la Compañía de Fomento notificó el 13 de octubre de 1961 a aquél y a su fiadora que daba por rescindido el contrato. La recurrente contrató la terminación de la obra con otro contratista, quien debía entregarla completada en o antes del 17 de abril de 1962. A este segundo contratista se le extendió el término para entregar hasta el 18 de julio de 1962.

A la fecha en que la recurrente dio por rescindido el contrato con León Rosado, dicho contratista había incurrido en una demora no autorizada de 262 días. Se computa ese término desde el 25 de enero de 1961, fecha en que había expirado la última prórroga que se le concedió, hasta el 13 de

---

(1) Posteriormente se convino por las partes un cambio en la obra que aumentó el precio a $369,785.35.

octubre del mismo año, fecha en que la recurrente rescindió el contrato.

En 20 de octubre de 1961 la recurrente tomó posesión física del proyecto y practicó un inventario de la obra realizada y de los materiales y equipo que allí había. La recurrente hizo un estimado del costo de terminación de la obra, el cual arrojó la cifra de $65,900.00.

A los fines de terminar la obra la recurrente convocó a una subasta y solicitó cotizaciones a varios contratistas por el trabajo que faltaba para la terminación del proyecto. La subasta se celebró el 6 de noviembre de 1961 pero la recurrente se vio obligada a anularla porque todas las cotizaciones sometidas por los licitadores excedieron grandemente el estimado de $65,900.00 hecho por la recurrente. Dichas cotizaciones fluctuaron desde $92,228.74 hasta $124,000.00.

Anulada la subasta la recurrente negoció con los licitadores tratando de obtener una cotización más baja y finalmente, en 13 de diciembre de 1961, la recurrente adjudicó al contratista Juan Díaz Rivera el contrato para la terminación del proyecto a base del costo más siete y medio por ciento de ganancia.

En el contrato con Díaz Rivera se fijó un plazo de 120 días para la terminación de la obra, plazo que venció el 17 de abril de 1962, pues la orden para comenzar los trabajos se le dio el 18 de diciembre de 1961. Díaz Rivera no pudo terminar la obra dentro del mencionado plazo y la recurrente le extendió el mismo hasta el 18 de julio de 1962.

El costo de terminación del proyecto, a tenor con el contrato con Díaz Rivera, fue de $71,701.26, cifra considerablemente menor que todas las cotizaciones que hicieron los licitadores en la subasta antes mencionada y que fue anulada por la recurrente.

En 11 de septiembre de 1963 la recurrente presentó una demanda en el Tribunal Superior, Sala de San Juan, contra Leonardo León Rosado y su fiadora mediante la cual reclamó,

luego de ser enmendada, la suma de $2,727.73 por concepto de costo de construcción en exceso del precio convenido en el contrato y la suma de $89,400.00 por concepto de daños líquidos a razón de $200.00 diarios, conforme se pactó en el contrato de construcción, por los 447 días de demora en la terminación de la obra, cuyo cumplimiento fue garantizado mediante la fianza expedida por la fiadora aquí recurrida.

Celebrado el juicio, el tribunal de instancia, aunque declaró con lugar la demanda, condenó a León Rosado a pagar a la demandante la suma de $55,127.73 "y de esa suma" condenó a la compañía fiadora a pagar a la demandante la suma de $15,927.73 más las costas y $1,000.00 de honorarios de abogado.[2]

La demandante, en su solicitud de revisión señala varios errores, los cuales, por estar relacionados entre sí, pueden sintetizarse como sigue:

1. Erró el tribunal en su interpretación de la cláusula Núm. 12 de las condiciones generales del contrato de construcción convenido entre la recurrente y León Rosado al concluir que la responsabilidad del contratista y de su fiadora por daños líquidos por demora se limitaba a solamente los 262 días comprendidos entre la fecha de expiración de la última prórroga concedida a León (24 enero 1961) y la fecha en que la recurrente rescindió el contrato (13 octubre 1961).

2. Erró el tribunal al resolver que la recurrente dejó de tomar medidas para reducir la cuantía de los daños líquidos de penalidad por demora y que por ello la fiadora era solamente responsable por el pago de daños líquidos correspondiente a solo los 66 días transcurridos desde la fecha de expiración de la última prórroga (24 enero 1961) hasta el 31 de marzo de 1961, fecha en que según el particular criterio del tribunal de instan-

---

[2] La condena por daños de $55,127.73 contra el contratista individualmente o el balance de ella luego de restarle los $15,927.73 que pagaría la fiadora, de prevalecer, es muy probable que resultase académica. Por eso es que en estos contratos de construcción de obras por sumas elevadas se exige la fianza de ejecución (*Performance Bond*).

cia, la recurrente debió haber rescindido el contrato con León Rosado.

■ Veamos, en primer lugar, si conforme a las cláusulas penales del contrato la Compañía de Fomento Industrial tenía derecho a indemnización por mora solamente desde la fecha en que venció la última prórroga concedida al contratista León hasta la fecha en que la Compañía rescindió el contrato, como entendió el tribunal de instancia, o si tenía derecho a indemnización desde que venció la última prórroga concedida a León y hasta la fecha en que el segundo contratista debió haber completado la obra, sin incluir la prórroga que posteriormente se le concedió a dicho segundo contratista.

En lo pertinente la cláusula Núm. 12 del contrato dispone como sigue:

"If the Contractor refuses or fails to prosecute the work . . . within the time specified or any extension thereof, or fails to complete said work within such time, the Puerto Rico Industrial Development Company may . . . terminate his right to proceed with the work. *In such event* the Puerto Rico Industrial Development Company may take over the work and prosecute the same to completion, by contract or otherwise, and *the Contractor and his sureties shall be liable* to the Puerto Rico Industrial Development Company for any excess cost occasioned to the Puerto Rico Industrial Development Co. thereby, *in addition to fixed, agreed and liquidated damages* stipulated in the Special Conditions for every calendar day of delay in the completion of the project *until the work is completed* to the satisfaction of the Puerto Rico Industrial Development Co. who shall exercise reasonable diligence in prosecuting such work to completion, by contract or otherwise; *provided further* that no such liquidated damages shall be charged against the Contractor herein for the days of delay incurred by the Puerto Rico Industrial Development Company or *any subsequent Contractor* in the completion of such work *within the term then fixed for such completion.* . . ." [3] (Énfasis suplido.)

_____

[3] La cláusula 12 aparece copiada *verbatim* en el Apéndice de esta opinión.

No hay duda de que dicha cláusula 12 tiene el significado y el propósito de que si la Compañía de Fomento Industrial se veía obligada a rescindir el contrato, en tal caso (*in such event*) el contratista y su fiadora (*the contractor and his sureties*) responderían por los daños por mora hasta que la obra quedase terminada (*until the work is completed*). Véase que en el disponiéndose (*provided further*) se establece que el contratista no responderá por *la mora* en que incurra *el contratista subsiguiente* en completar la obra dentro del término *entonces* fijado (*days of delay incurred by . . . any subsequent contractor in the completion of such work within the term then fixed for such completion.*), pero sí responde el término que, dentro del segundo contrato, le tome completarla (*until the work is completed*).

En síntesis, la cláusula referida provee que el contratista León y su fiadora responden por el retraso en la entrega hasta que la obra quede terminada, aunque sea por un segundo contratista, pero sin incluir los días de retraso en que ese segundo contratista incurriese. La obligación de la fiadora es, desde luego, solidaria con la de León.

El texto de dicha cláusula 12, en lo pertinente, es claro y no necesita mayor interpretación, pero si fuese necesario acudir a la jurisprudencia vigente la misma le es adversa a la recurrida y favorable a la recurrente. En *Cristy y Sánchez* v. *E.L.A.*, 84 D.P.R. 236 (1961), dijimos a la pág. 244, lo siguiente:

"La interpretación restrictiva tuvo su auge en el tiempo en que los fiadores personales, por un mero acto de liberalidad, afianzaban el contrato de obra pública, pero perdió su popularidad con el advenimiento de las compañías fiadoras que se dedican al negocio de prestar fianza mediante el pago de primas. En cuanto a la fianza de una obra pública se refiere, puede decirse, que contrario a lo que generalmente se supone, la interpretación liberal o inclusiva es la que prevalece. . . ."

En dicho caso de *Cristy*, en la página citada, revocamos expresamente la jurisprudencia que existía en sentido contrario. Pueden verse allí los casos revocados. En *Arsuaga* v. *La Hood Constructors*, 90 D.P.R. 104, 121 (1964), citamos y seguimos a *Cristy*, supra. Igualmente hicimos en *Ulpiano Casal* v. *Totty Manufacturing Corp.*, 90 D.P.R. 739 (1964), en donde dijimos, a la pág. 745, citando a un tribunal de otra jurisdicción, que:

"El principio de que un fiador es un favorito del derecho no es de aplicación propiamente en el caso de una compañía organizada con el propósito expreso de actuar como fiadora mediante compensación."

Sostener la interpretación que a la cláusula 12 dio el tribunal de instancia equivaldría a poner a la Compañía de Fomento en la poco razonable disyuntiva de rescindir el contrato sin derecho a daños por mora a partir de la fecha de rescisión, o de permitir que el contratista original completase morosamente, en perjuicio del fin público de la obra, con el fin de no perder la indemnización por mora. Desde luego, eso no fue lo que se contrató.

Se cometió el primer error antes señalado. Como hemos visto, la Compañía de Fomento Industrial tiene derecho, bajo los términos del contrato, a ser indemnizada por los 447 días de mora que comprende el período desde que venció la última prórroga concedida a León (24 enero 1961) hasta la fecha en que el segundo contratista debió haber completado la obra, el 17 de abril de 1962. Este período *no incluye* la prórroga hasta el 18 de julio de 1962 que la Compañía de Fomento concedió al segundo contratista. Así lo dispone la cláusula 12.

La segunda cuestión que plantea la recurrente es que fue erróneo exonerar a la fiadora de parte de la obligación, por entender el tribunal que la recurrente no fue diligente en rescindir el contrato con el fin de mitigar los daños por mora.

La cuestión de si la demandante cumplió con su deber de mitigar los daños hay que determinarla a base de la situación prevaleciente al momento en que se presentó el problema; y si la demandante escogió un curso de acción razonable no incumplió dicho deber por el hecho de que *a posteriori* se pueda creer que otro curso de acción pudo haber resultado más favorable para la demandada. *In Re Kellet Aircraft Corp.*, 186 F.2d 197, 198 (1950). El deber de mitigar daños no surge mientras hay una razonable esperanza de que la otra parte cumplirá con la ejecución del contrato. *United States* v. *Russell Electric Co.*, 250 F.Supp. 2, 17 (1965). Aunque ya se haya violado el contrato, si hay negociaciones pendientes entre las partes encaminadas a que se cumpla el mismo y si aquéllas pueden albergar razonablemente la esperanza de que así se hará, no surge la obligación de mitigar. *United States* v. *Russell Electric*, supra, pág. 20.

A la luz de estas normas no procede en este caso reducir la indemnización por mora en la entrega de la obra. La parte que cumple sus obligaciones es la favorecida por el derecho y no la parte que las incumple. Veamos más adelante los hechos que nos han llevado a concluir que el segundo error también se cometió.

La obra, como hemos dicho, debió haberse comenzado a fines de febrero de 1960. Varios meses más tarde empezaron a notarse deficiencias en la misma pero para fines de octubre de ese año ya el contratista había completado el 85.9% de la obra y había recibido pagos parciales montantes a la suma de $255,316.82. Esta suma no incluye el pago por los trabajos realizados en octubre. Después que fue hecho el pago correspondiente al trabajo realizado en octubre, el Jefe del Departamento de Construcción de la recurrente escribió al Supervisor Becerril ordenándole que no certificara pagos adicionales hasta que las deficiencias que éste último había señalado en octubre fueran corregidas por el contratista.

Posteriormente se llegó a un acuerdo mediante el cual el contratista, en 19 de diciembre, recibió un cheque por $30,735.00 por concepto del trabajo hasta entonces completado pero sin incluir el trabajo defectuoso. El último pago que se hizo al contratista tiene fecha de 27 de febrero de 1961 y ascendió a $14,760.00. Hasta esa fecha la recurrente había pagado a León sumas montantes a $300,811.82, por concepto de haber completado un 90.3% de la obra. Dicha suma equivale a 9/10 partes del precio de la obra hasta entonces realizado.

Desde fines de octubre de 1960 hasta fines de febrero de 1961 sólo hubo un informe adicional de deficiencias. En los meses de marzo a julio de 1961 hubo varios informes sobre la lentitud en el progreso de la obra.

El 14 de febrero de 1961 León solicitó una prórroga para que se extendiera la fecha de entrega del 15 de noviembre de 1960 hasta el 30 de marzo de 1961. El entonces Supervisor Colbert Rodríguez en 24 de marzo informó a sus superiores que estaba completamente seguro de que el contratista no podría terminar la obra dentro de ese plazo. En ese momento la recurrente se confrontó con la siguiente situación: (1) sabía que la obra tenía ciertas deficiencias, lo que es corriente en toda obra de construcción; (2) había ya pagado más de $300,000.00 por un 90.3% de la obra; (3) la obra estaba vencida desde el 15 de noviembre por lo que tenía derecho a penalidades por mora ascendentes a $27,000.00 por 135 días de retraso y (4) tenía retenido en su poder $68,973.53 que comprendía un 10% de retención (conforme al contrato) y la suma estimada correspondiente al trabajo que faltaba por completar.

En vista de esas circunstancias la recurrente estimó prudente no rescindir el contrato en ese momento sino que le concedió una última oportunidad al contratista para que completara la obra y corrigiera las deficiencias.

En vista de la considerable suma ya comprometida y de la relativamente pequeña parte de la obra que faltaba por completar, no podemos tachar de irrazonable el curso que tomó la recurrente ante esa situación. Ningún riesgo había para la fiadora ni para la recurrente que requiriese tomar el curso drástico de rescindir el contrato en ese momento, ya que la *suma retenida era suficiente para cobrar las penalidades por mora* en que a esa fecha León había incurrido y para pagarle a éste la diferencia que le restaba. Si el contratista pedía en ese momento una prórroga hasta el 30 de marzo de 1961 lo más razonable era concedérsela, ya que de lo contrario había que rescindir el contrato y conseguir otro contratista que completara la obra, contratiempo de primer orden que necesariamente habría de traer más retraso, con las correspondientes penalidades.

En vista de la suma que la recurrente tenía retenida en su poder era razonable pensar que no era probable que hubiese que repetir contra la fiadora para que ésta cubriera penalidad alguna por concepto de mora. Si el contratista León terminaba morosamente, sólo tenía derecho a recibir la diferencia entre la cantidad retenida y las penalidades. El hecho de que el Supervisor Rodríguez dijese que estaba seguro de que el contratista no habría de terminar la obra el 30 de marzo no tiene el peso que el tribunal de instancia le atribuyó y lo que aparentemente lo indujo a concluir que la recurrente debió haber rescindido en esa fecha. El alcance que realmente tiene esa expresión de Rodríguez es que él estimó que la obra no sería completada en los seis días siguientes. Entendemos que ante aquella situación, la decisión de la recurrente fue razonable al notificar al contratista en 5 de abril de 1961 que si dentro de los diez próximos días no demostraba que podía completar la obra antes del 31 de ese mes se procedería a rescindir el contrato.

Este aviso no fue acatado ni contestado por el contratista, viéndose obligada la recurrente en 18 de abril a solicitar de

su Asesor Legal, que procediera a rescindir el contrato. Luego de los trámites correspondientes el caso fue entregado a sus abogados, quienes en 2 de mayo escribieron a la fiadora invitándola a concertar una entrevista con la recurrente y el contratista para gestionar una pronta solución al asunto. Dicha entrevista se celebró antes del día 8 siguiente, aparentemente sin la presencia de la fiadora. Como resultado de la entrevista se suspendió la rescisión del contrato.

En relación con la correspondencia entre la recurrente y la fiadora hay un incidente relacionado con una cifra borrada o equivocada pero que entendemos que los eventos subsiguientes lo aclaran. En 11 de mayo de 1961 la fiadora envió un formulario impreso a la recurrente solicitando que se indicara qué por ciento de la obra había sido completado y cualquier comentario pertinente. Este formulario fue cumplimentado por Pedro F. Rivera el Jefe de la Sección de Contratos de la recurrente. En él se hizo constar que la entrega de la obra estaba vencida y es sobre el por ciento completado de la obra que surge el incidente. La fiadora alega que la recurrente la indujo a error al informarle que el 97% de la obra había sido completado, cuando unos días más tarde, en otro informe la recurrente le informó que el por ciento completado era el 86%. Al presentársele a Pedro Rivera en el juicio ese formulario y al preguntársele específicamente sobre ese por ciento él contestó "Yo veo que el 9 . . . veo como que el 9 está borrado." T.E. pág. 204. (Se refiere al 9 de la cifra 97.) En efecto puede apreciarse en dicho formulario, Exhibit "E" de la demandada, que hay un borrón donde aparece ese 9. Para ayudar a formar juicio sobre el por ciento completado para mayo de 1961—si era 87 ó 97%—es útil tener en mente que en ese mismo mes de mayo la fiadora pidió esa información otra vez (en vista de una reclamación que un suplidor de la obra le había hecho) y la recurrente le con-

testó que el 86% de la obra había sido completado y que se había pagado $286,051.82.

A partir del 2 de mayo de 1961 la fiadora sabía que el contrato estaba vencido desde noviembre de 1960 y en el informe de 16 de mayo la recurrente vuelve a informarle que la entrega está vencida. Teniendo conocimiento de la mora la fiadora pudo haber pedido información de cuál era la situación completa en relación con el contratista León Rosado. No lo hizo. La recurrente no venía obligada a mantener informada a la fiadora del progreso de la obra, salvo pacto en contrario, y no surge de la evidencia que existiese tal pacto.

Ahora bien, la recurrente no solo actuó prudentemente dentro de las circunstancias sino que, como cuestión de hecho, mitigó los daños por mora. Esto lo hizo cuando el contratista en 27 de junio de 1961 escribió a la recurrente pidiendo prórroga para que se extendiera la fecha de entrega desde el 15 de noviembre de 1960 hasta el 15 de julio de 1961. Dicha petición fue investigada por el Supervisor Colbert Rodríguez, quien en 8 de septiembre escribió al Jefe del Departamento de Construcciones recomendando una prórroga hasta el 24 de enero de 1961. La recomendación fue aceptada por dicho jefe y notificada al contratista en 15 de septiembre de 1961, indicándosele además que la concesión de dicha prórroga no debía interpretarse como una renuncia a la penalidad por mora. Obsérvese que si la recurrente rescindía el contrato en este momento podía reclamar alrededor de $66,000.00 por concepto de mora desde el 15 de noviembre de 1960 hasta el 15 de septiembre de 1961. En cambio, la recurrente extendió el vencimiento del contrato desde el 15 de noviembre hasta 24 de enero, reduciendo así en $14,000.00 su derecho a cobrar penalidad por mora. Mitigó en esa suma los daños.

De los hechos del caso tenemos que concluir que la recurrente no sólo hizo esfuerzos por mitigar los daños sino que

también en las ocasiones en que pudo haber rescindido el contrato actuó en la forma que en el momento parecía más razonable, concediendo al contratista oportunidad para completar la obra. La fiadora misma, en circunstancias menos alentadoras, solicitó a la recurrente que diera al contratista otra oportunidad adicional para terminar la obra. Veamos.

En 13 de octubre de 1961, cuando ya la recurrente había abandonado toda esperanza de que el contratista terminara en tiempo razonable la obra, le escribió a éste, con copia a la fiadora, rescindiendo el contrato. Indicó en dicha carta que hasta entonces la demora era de 262 días y que la penalidad ascendía a $26,000.00. [4] Seis días después, en 19 de octubre de 1961, la fiadora escribió a la recurrente y lejos de criticarla por no haber rescindido el contrato, por el contrario, aun después de saber que había un retraso de 262 días, propuso a la recurrente que no lo rescindiese y que le concediese al contratista hasta el 15 de noviembre de 1961 para terminar.

Queda pues demostrado que la fiadora no solo no cuestionó la razonabilidad de la conducta de la recurrente al conceder al contratista la oportunidad de completar, sino que entendió que sus intereses quedaban protegidos si se le concedía una oportunidad adicional para completar. El curso de acción que la fiadora entendió que protegía sus intereses es el mismo que la recurrente entendió que era el mejor curso a seguir, meses antes cuando las perspectivas parecían aún más alentadoras.

◼ No creemos que se le debe imputar a la recurrente falta de diligencia en mitigar los daños por haber tomado un curso de acción razonable y que meses después, cuando la situación era peor, la misma fiadora entendió que lo era. Recuérdese que la doctrina de mitigación de daños está

---

[4] El cómputo, por error, se hizo a razón de $100.00 diarios cuando debió ser a razón de $200.00, según los términos del contrato. Véase Art. 4 del Contrato, Exhibit 1 Demandante y T.E. pág. 149.

predicada en la razonabilidad de la conducta del demandante al momento de enfrentarse a una situación crítica y en este caso la razonabilidad de dicha conducta quedó constatada por la conducta posterior de la demandada. Si a la fiadora le parecía entonces razonable, hasta el extremo de proponerlo, conceder al contratista tiempo adicional para terminar, mal puede luego en el juicio oponer como defensa contra la recurrente que ésta actuó irrazonablemente al concederlo.

Más aún, cabe mencionar que la recurrente hizo esfuerzos para mitigar los daños, ya que, como vimos antes, rechazó varias propuestas para terminar la obra hasta conseguir una que resultó en un costo adicional de sólo $2,727.73 sobre el precio del contrato rescindido y mucho menos que las licitaciones que hicieron en la subasta antes mencionada.

A la luz de lo discutido entendemos que la recurrente no incumplió su obligación de mitigar los daños y que erró el tribunal al reducir el monto de la indemnización por mora aplicando dicho doctrina.

Por último, no creemos que debemos reducir la suma de los daños por mora. Nada hay en el récord que indique cuál era el rédito que la recurrente habría de obtener mediante el arrendamiento de las facilidades a construirse en esa urbanización industrial, ni cuál era el valor total de las mismas. A modo de ejemplo, cabe señalar que un rédito de $200.00 diarios, que es la penalidad pactada en este caso, requería una inversión de $600,000.00 a razón de 12% anual, tipo permitido por la Ley de Alquileres Razonables. Aunque no sabemos el valor del terreno y el de lo que allí habría de construirse es razonable pensar que dicho valor sería considerable pues, como se ha visto, sólo las mejoras al terreno cuya construcción se confió a León Rosado tenían un valor de $369,785.35. Ese valor considerable de los terrenos y de las mejoras lo tuvo la recurrente estancado en la obra por más de un año debido al incumplimiento por parte de León.

Además de esos daños económicos o materiales sufridos por la recurrente—frente a los cuales la suma líquida por daños resulta razonable—hay que considerar los daños inconmensurables ocasionados al pueblo de Puerto Rico (país sobrepoblado y con un alto índice de desempleo) por haberse retrasado la construcción de esa urbanización industrial por el término de un año, dos meses y 22 días.

*La sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 21 de marzo de 1966 se modificará en el sentido de condenar a los demandados Leonardo León Rosado y American Surety Company of New York a pagar solidariamente a la demandante, Compañía de Fomento Industrial de Puerto Rico, las sumas de $2,727.73 por concepto de costo de construcción en exceso del precio convenido en el contrato aquí concernido y de $89,400.00 por concepto de daños líquidos, más los intereses, las costas y $5,000.00 por concepto de honorarios de abogado, y así modificada se confirmará.*

El Juez Presidente Interino Señor Pérez Pimentel y los Jueces Asociados Señores Ramírez Bages y Martínez Muñoz no intervinieron.

—O—

*Apéndice*

"*12. Delays—Damages:*

If the Contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion, within the time specified or any extension thereof, or fails to complete said work within such time, the Puerto Rico Industrial Development Company may, by written notice to the Contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. In such event the Puerto Rico Industrial Development Company may take over the work and

prosecute the same to completion, by contract or otherwise, and the Contractor and his sureties shall be liable to the Puerto Rico Industrial Development Company for any excess cost occasioned to the Puerto Rico Industrial Development Co. thereby, in addition to fixed, agreed and liquidated damages stipulated in the Special Conditions for every calendar day of delay in the completion of the project until the work is completed to the satisfaction of the Puerto Rico Industrial Development Co. who shall exercise reasonable diligence in prosecuting such work to completion, by contract or otherwise; provided further, that no such liquidated damages shall be charged against the Contractor herein for the days of delay incurred by the Puerto Rico Industrial Development Company or any subsequent Contractor in the completion of such work within the term then fixed for such completion. If the Contractor's right to proceed is so terminated, the Puerto Rico Industrial Development Co. may take possession of and utilize in completing the work such materials, appliances, and plant as may be on the site of the work, and necessary therefor. If the Puerto Rico Industrial Development Company does not terminate the right of the Contractor to proceed, the Contractor shall continue the work, in which event the actual damages for the delay will be impossible to determine and in lieu thereof, the Contractor shall pay to the Puerto Rico Industrial Development Co. as fixed, agreed, and liquidated damages for each calendar day of delay until the work is completed or accepted the amount as set forth elsewhere in the Contract Documents. This amount shall be deducted from the Contract Price for each and every calendar day after the date within which completion was required up to and including the date of completion and acceptance of the work. Said sum being specifically agreed upon as the measure of damages to the Puerto Rico Industrial Development Co. by reason of delay in the completion of the work; and the Contractor agrees and consents

that the Contract price be reduced by the aggregate of damages so deducted and shall be accepted in full satisfaction for all work done under the Contract. Provided that the right of the Contractor to proceed shall not be terminated or the Contractor charged with liquidated damages because of any delays in the completion of the work due to unforeseeable causes beyond the control and without the fault or negligence of the Contractor, including, but not restricted to, acts of God, or of the public enemy, acts of the Puerto Rico Industrial Development Co., fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, and extremely heavy and continuous rainfall or delays of subcontractors due to such causes.

*Provided further* that the Contractor shall, within 10 days from the beginning of any such delay, notify the Puerto Rico Industrial Development Co. in writing of the causes of the delay and any failure of the Contractor to give the Puerto Rico Industrial Development Company such a written notice will be considered by the latter as a formal waiver of the Contractor of any and all claims for extra time for such delays as herein provided. The Engineer shall ascertain the fact and the extent of the delay and the Puerto Rico Industrial Development Co. shall extend the time for completing the work when in the judgment of the Engineer the findings of fact justify such an extension. Where the cause of the delay is due to weather conditions which render the performance of work impossible, an extension of one work day will be given the Contractor for each work day lost by the Contractor because of said weather conditions."