**In re WPRV–TV, INC., f/k/a WSTE–TV, Inc., ID # 73–1203170, Debtor.**

**Bankruptcy No. 87–01393.**

United States Bankruptcy Court, E.D. Oklahoma.

Aug. 18, 1988.

Dale Gilsinger, Don Marlar, Tulsa, Okl., for debtor.

Terry Thomas, Tulsa, Okl., for Major League Baseball.

## ORDER

JAMES E. RYAN, Bankruptcy Judge.

On July 15, 1988, this Court conducted a hearing regarding WPRV'S (DIP) Objection to the Proof of Claim of creditor Major League Baseball (MLB). Appearances were made by Mr. Dale Gilsinger and Mr. Don Marlar on behalf of the DIP and Mr. Terry Thomas representing MLB.

Evidence was taken in this matter at the time of the hearing. In addition, the parties were instructed to submit briefs stating the legal authority supporting their respective positions regarding the duty of MLB to mitigate damages arising from the DIP'S breach of contract. The parties proceeded to file briefs in this matter, all having been received by August 1, 1988.

After review of the evidence, the Briefs submitted and the applicable law in this area, we FIND:

## FINDINGS OF FACT

1. This is a "core" matter pursuant to 28 U.S.C. § 157(b).

2. DIP operates a television station servicing the Commonwealth of Puerto Rico. The corporate headquarters of the DIP is located in Muskogee, Oklahoma, thereby conferring jurisdiction to this Court.

3. Business transactions between the parties began in 1985 when the DIP entered into a contract with MLB to purchase broadcast rights for the 1986 Major League Baseball Season. The DIP televised 55 games that season and paid for those games in full according to the terms of the contract.

At the conclusion of the 1986 Season, the parties negotiated a contract for future broadcast rights encompassing the 1987 through 1989 Major League Baseball Seasons. The terms of this agreement stated that a minimum of 40 games would be televised during prime time viewing hours under the following payment schedule:

1987—$120,000+ (those games over 40 × $2,250)

1988—$130,000+ (those games over 40 × $2,437.50)

1989—$140,000+ (those games over 40 × $2,625)

4. During the course of 1987, the DIP broadcasted the required minimum number of games in compliance with the contract but failed to make full payment of the amount due and owing MLB. There remains a shortfall of $74,000 due on this amount.

5. Upon this breach of contract, the parties conducted negotiations between Mr. Richard Sevenoaks, the Station Manager, and Mr. David Alworth, the MLB representative in charge of international contract negotiations for baseball television rights. The result of these negotiations was an agreement, in July, 1987, setting forth a payment schedule whereby the DIP could cure the defaulted amount and continue under the terms of the contract.

6. The DIP failed to adhere to the curing agreement and remained in default. This resulted in a letter from MLB dated November 23, 1987 to the DIP terminating the agreement stating:

> "We consider WPRV–TV, Inc. to have materially breached our ... agreement. We hereby terminate that agreement and reclaim our rights to sell telecasts of any Major League Baseball games in the market of Puerto Rico in future years. WPRV–TV, Inc. has forfeited its right to purchase telecasts from Baseball in 1988 and 1989.... We will immediately begin to negotiate with third parties in Puerto Rico for the sale of television rights to baseball games in future years."

7. In December of 1987, Mr. Sevenoaks spoke with Mr. Alworth affirming that the DIP could not perform on the 1988 contract, but offered to purchase 40 games by tendering in advance payments prior to broadcasting. On December 3, 1987, the DIP sought Chapter 11 relief under the U.S. Bankruptcy Code.

8. In January, 1988, Mr. Sevenoaks, on behalf of the DIP, memorialized in a letter to Mr. Alworth the advance payment offer discussed in December, 1987. Further, in a letter dated March 3, 1988, DIP offered to purchase the 1988 Season under these "pay-as-you-broadcast" terms.

Mr. Sevenoaks was advised that Mr. Louise Gomez had purchased those rights for the Puerto Rico market and the right to broadcast could be purchased from Mr. Gomez. MLB sold these rights to Mr. Gomez for $58,000, incurring $8,000 in expenses in procuring the willing buyer. Although others showed interest in purchasing the rights, only Mr. Gomez offered a concrete dollar amount.

The lower price obtained from Mr. Gomez was attributable to the inability of purchasers to broadcast the games in prime time, when advertising rates are at a premium. Only the DIP demonstrated this ability.

9. The stated major concern of MLB in securing a buyer for the 1988 season was broadcast continuity in the market with a goal of popularizing baseball in international markets such as Puerto Rico. The DIP could not offer this assurance of continuity.

10. MLB has not negotiated for the 1989 Season but will do so at the conclusion of 1988. The Proof of Claim filed with this Court by MLB states an amount of $334,-000. However, this amount was reduced at the hearing by MLB to $294,000, taking into account the mitigated amount received from Mr. Gomez.

### CONCLUSIONS OF LAW

A. A duty is placed on an aggrieved party in a breach of a contract to mitigate or lessen the damages performed against him. *Hidalgo Properties, Inc. v. Wachovia Mortgage Company*, 617 F.2d 196, 200 (10th Cir.1979). However, one who is injured by the acts of another is not required to unreasonably exert himself or to incur an unreasonable expense in order to do so. *Sackett v. Rose*, 154 P. 1177 (Okla.1916).

In the instant case, the DIP is asking in hindsight for MLB to forget about the past transgressions which had already occurred—forget about the failure to pay according to the terms of a written contract, forget about the failure to cure past defaulted amounts pursuant to a subsequent agreement and forget about the Bankruptcy and the obvious financial difficulties which the DIP was experiencing. This does not seem to be a "reasonable" course which the DIP would require MLB to follow. The DIP did indeed offer an option to MLB. However, "reasonableness" requires the creditor to only consider viable options. Such was not presented by the DIP in this case since there was no show-

ing of the DIP'S ability to generate a scintilla of net revenue in advance of broadcasting or otherwise.

 B. In a case where a defaulting buyer is offering to purchase, there is a duty upon the seller to consider such an offer. However, the crucial test in such circumstances is "did they use such care and diligence in the crisis when the breach occurred as a man of ordinary prudence and diligence would have used under the circumstances then existing?" *Key v. Kingwood Oil Co.*, 110 Okl. 178, 236 P. 598 (1924). In the present case, this Court would answer in the affirmative. MLB immediately terminated the contract between the parties so as to enable it to sell the rights elsewhere. This was done only after first trying to negotiate with the DIP to cure and continue broadcasting. Soon thereafter, MLB diligently obtained a buyer so as to secure a broadcaster and reduce damages.

C. This Court cannot willingly dictate to a business what the wise and prudent course of action would be in making a business decision such as in this case. Further, the DIP cannot likewise second-guess the actions of MLB because:

> "Where a choice has been required between two reasonable courses, the person whose wrong forced the choice cannot complain that one rather than the other was chosen.
>
> The rule of mitigation of damages may not be invoked by a contract breaker as a basis for hypercritical examination of the conduct of the injured party, or merely for the purpose of showing that the injured person might have taken steps which seemed wiser or would have been more advantageous to the defaulter ... One is not obligated to exalt the interests of the defaulter to his own probable detriment."

*In re Kellett Aircraft Corp.*, 186 F.2d 197, 198–99 (3d Cir.1950).

D. The parties agree that $74,000 remains due on the 1987 contract. Also, since we find MLB'S efforts at mitigation reasonable under the circumstances, there remains $80,000 due on the 1988 contract.

However, since the time for negotiations on the 1989 contract remains, MLB can still recover its lost contract amount. Thus, no damages will be allowed for this term.

IT IS THEREFORE ORDERED that Major League Baseball's claim in the amount of $154,000 is approved.